691 N.E.2d 1174 (1998)
295 Ill. App.3d 182
229 Ill.Dec. 451
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Ian E. PITTS, Defendant-Appellant.
No. 4-97-0071.
Appellate Court of Illinois, Fourth District.
March 2, 1998.
Rehearing Denied April 9, 1998.
*1175 Daniel D. Yuhas, Deputy Defender, Arden J. Lang, Asst. Defender, Office of State Appellate Defender, Springfield, for Ian Pitts.
Lawrence R. Fichter, State's Atty., Decatur, Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, Linda Susan McClain, Staff Atty., State's Attorneys Appellate Prosecutor, Springfield, for People.
Justice STEIGMANN delivered the opinion of the court:
In June 1996, the State charged defendant, Ian E. Pitts, with two separate counts of attempt (first degree murder) (720 ILCS 5/8-4(a) (West 1994); 9-1(a)(1) (West Supp. 1995)), two separate counts of armed violence (720 ILCS 5/33A-2 (West 1994)), armed robbery (720 ILCS 5/18-2(a) (West 1994)), aggravated vehicular hijacking (720 ILCS 5/18-4(a)(3) (West 1994)), and burglary (720 ILCS 5/19-1(a) (West 1994)). In August 1996, defendant pleaded guilty to both attempt (first degree murder) counts and armed robbery, pursuant to the State's agreement to dismiss the remaining charges. The parties had no agreement regarding the sentence the trial court would impose.
In October 1996, the trial court sentenced defendant to 15 years in prison on each attempt (first degree murder) conviction and six years in prison on the armed robbery conviction, with all sentences to be served consecutively.
At the conclusion of the sentencing hearing, the trial court stated its agreement with the prosecutor that defendant would have to serve 85% of his prison sentences as a result of the then-recently enacted "truth-in-sentencing" statute (730 ILCS 5/3-6-3(a)(2)(ii) (West Supp.1995)), which modified section 3-6-3 of the Unified Code of Corrections (Code) (730 ILCS 5/3-6-3(a)(2) (West 1994)) to limit good conduct credit to no more than 4.5 days per month for a prisoner serving a sentence of attempt (first degree murder).
Defendant appeals, arguing that (1) his aggregate 36-year prison sentence was excessive and constitutes an abuse of the trial court's discretion; and (2) Public Act 89-404 (Pub.Act 89-404, § 40, eff. August 20, 1995 (1995 Ill. Laws 4306, 4323-27)), which created the "truth-in-sentencing" statute, is unconstitutional because (a) it violates the single subject rule of the Illinois Constitution (Ill. Const.1970, art. IV, § 8(d)), and (b) it violates the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const.1970, art. I, § 2). We reject defendant's first argument but agree that the "truth-in-sentencing" statute violates the single subject rule of the Illinois Constitution. Accordingly, we affirm and remand with directions.

I. BACKGROUND
When defendant pleaded guilty in August 1996, the trial court adopted the factual basis previously presented at codefendant Jody Rinderer's guilty plea hearing. The parties also stipulated that Amanda Jones, another codefendant, would testify that the three male codefendants (defendant, Rinderer, and Jason Gaddis) agreed ahead of time that they were going to kill Victoria Bridgeman and *1176 steal her car. After the attack, defendant admitted that he had stabbed Bridgeman.
At the sentencing hearing, the trial court received evidence from both parties, including a personality inventory regarding defendant and a presentence report prepared by the probation department. The court also heard arguments and suggestions of counsel.
Information before the trial court at the sentencing hearing revealed the following. Bridgeman met defendant through a friend's neighbor and had known him for approximately two years. Defendant subsequently introduced her to Gaddis and Rinderer. On the evening of April 23, 1996, Bridgeman, defendant, Gaddis, and Rinderer were together in Bridgeman's car, which was parked "in the country." Bridgeman was seated in the driver's seat, Gaddis was in the front passenger seat, and defendant and Rinderer were in the back. Bridgeman testified that Rinderer "had been acting like a creep all night," telling her that she needed to respect him. After Bridgeman disagreed with him, the three codefendants left the vehicle ostensibly to use the bathroom.
Upon returning three to five minutes later, each of them took a new position in the car, with defendant seated beside Bridgeman and Gaddis behind her. Bridgeman and Rinderer continued arguing, and Bridgeman turned to "get input" from Gaddis. At that point, Gaddis put a cord around her neck and began stran gling her. Defendant then turned toward Bridgeman, kneeling on the front seat, and began punching her in the face. Bridgeman described that initial portion of the attack as follows:
"I was trying to get a hold of [Gaddis]. They were all yelling, and I had mymy right hand underneath the cord trying to pull it away from my neck, and [defendant] just kept hitting me and hitting me. They kept yelling `Get her.'"
Bridgeman lost consciousness. When Bridgeman awakened, her three assailants stood her up beside her car, and defendant hit her in the head with a whiskey bottle. They then began kicking her, yelling "Die bitch." Bridgeman once again lost consciousness; when Bridgeman reawakened, her assailants were trying to drag her into a ditch. She tried to fight them off and "was stabbed a few times." Once in the ditch, they kicked her and continued to yell "Die bitch." Bridgeman estimated that her three assailants yelled "Die bitch" at least 100 times during the attack. Bridgeman began pleading for her life, telling them to leave her to "die in peace." At that point, someone kicked her again, and they drove away in her car.
Bridgeman then stood up and tried "to head to safety." She stated that she had not gotten far when she saw the car turn around. She fell back to the ground on her stomach and heard them get out of her car. (By this time, her eyes were swollen shut.) One of the three walked up to her and felt for a pulse. She then heard someone say, "She isn't dead. Finish her off." After defendant and Gaddis prodded Rinderer to slash her throat, Rinderer did so. In an attempt to get them "to leave when I was dying," Bridgeman grabbed her throat and acted like she was choking on her own blood. At that point, her three assailants returned to her car, turned up the stereo, and left. After once again losing and regaining consciousness, Bridgeman walked to find help.
As a result of the attack (during which she was stabbed at least 23 times), Bridgeman was hospitalized for one week, and accumulated medical bills totalling $50,000. She has several scars, including "a very big indentation" on her head, one on her left eye, one across the bridge of her nose, one on her right cheek and across her nose to her left cheek, "a very big slash" on the right side of her throat, and others "all over" her upper torso, including several scars on her breasts. Bridgeman described the impact of the attack on her life, as follows:
"I don't trust anybody. I used to trust absolutely everybody. Apparently not anymore. I am scared to go to my car. I am scared to be in the car. I cannot have anybody sitting in the backseat for fear what could happen if they do. And I can only be pretty much in well-lit areas with somebody like my sister and my mother."
Louis Pitts, defendant's father, testified on his behalf that defendant had psychiatric problems growing up and had previously been hospitalized and medicated for his "out-burst *1177 disorder." Defendant stopped taking his medications because they caused side effects and were expensive, and he "seemed to be doing pretty good."
The presentence report indicated that defendant, who was 16 years old at the time of the offense, was a member of a street gang, uses alcohol daily and drugs on a regular basis, sells drugs, and has an "explosive disorder" that causes him to become violent when angry. In September 1993, the trial court adjudicated him delinquent for committing theft. Defendant subsequently violated court supervision by committing the offenses of aggravated battery and battery. He was then sentenced to probation, and after he violated several probation conditions, the court ordered his probation terminated as unsuccessful. In May 1995, defendant *1188 of the defendant's U-Haul truck exceeded the scope of the defendant's consent. Therefore, we reverse.

FACTS
On the morning of February 28, 1996, the defendant was driving a U-Haul truck on Interstate 80 in Henry County when he was stopped for speeding by Illinois State Police Sergeant James Buysse. The defendant presented Buysse with his driver's license and the truck's rental agreement. Buysse testified that the rental agreement listed the defendant as the renter of the truck. Buysse informed the defendant that he would receive a warning ticket for speeding and asked him to accompany him back to the squad car. The passenger travelling with the defendant, Agipato Almonte, waited in the truck.
While they were sitting in the squad car, Buysse noticed that the defendant appeared to be nervous because he was wringing his hands and repeatedly glancing out the window. The defendant explained that the passenger in the truck was his uncle who was along to help with the driving. At the suppression hearing, Buysse testified that the defendant could not remember his passenger's name. At trial, Buysse testified that the defendant identified the passenger by a false name, although he could not remember the name that the defendant gave.
Buysse then approached Almonte who was still sitting in the cab of the U-Haul. After Almonte produced his identification card, Buysse observed that he spoke very little English. When asked if he was related to the defendant, Almonte shook his head and said "no." However, Buysse did not know whether Almonte understood his questions.
After speaking to Almonte, Buysse returned to his squad car and resumed questioning the defendant. The defendant explained that he was moving to Detroit to begin a new job and that the U-Haul contained his personal belongings. Buysse asked the defendant if he could "take a look" inside the back of the U-Haul. The defendant responded by saying, "sure." Buysse did not tell the defendant the reason for his request or what he was looking for.
After suggesting that the defendant remain in the squad car, Buysse approached the truck with two other troopers who had arrived on the scene. Upon opening the rear cargo door, Buysse saw various items, including couches, dressers, a headboard, mattresses, and bicycles. He also noticed a roll of packing tape and thought it unusual because he saw no boxes.
Buysse and one of the other officers entered the cargo hold of the truck and began moving items around. After moving one of the couches which was lying upside down on another couch, Buysse observed three cardboard boxes. At the suppression hearing, Buysse testified that the boxes were sealed with tape and he had to cut them open. At trial, he testified that the boxes were not taped closed, but the flaps were folded down. Inside the first box Buysse found an object wrapped in duct tape. Upon cutting the object open, he found a green leafy substance that would later field test as cannabis. Further investigation revealed that the boxes contained 188 pounds of cannabis.
On appeal, the defendant raises the following issues: (1) the trial court's denial of his motion to suppress the evidence; (2) the trial court's admission of Buysse's hearsay testimony as to the name written on the rental agreement; (3) the State's failure to prove him guilty beyond a reasonable doubt; and (4) the propriety of his sentence in light of our supreme court's recent decision striking down Public Act 89-428, which amended the code provisions under which he was sentenced. See Johnson v. Edgar, 176 Ill.2d 499, 224 Ill.Dec. 1, 680 N.E.2d 1372 (1997).

ANALYSIS
Ordinarily a trial court's ruling on a motion to suppress evidence will not be disturbed on appeal unless it is manifestly erroneous. People v. James, 163 Ill.2d 302, 310, 206 Ill.Dec. 190, 194, 645 N.E.2d 195, 199 (1994). However, when a determination concerning an individual's constitutional rights depends on a legal conclusion which is based upon undisputed facts, the decision should be reviewed as a matter of law. People v. Anaya, 279 Ill.App.3d 940, 945, 216 Ill.Dec. 465, 468, 665 N.E.2d 525, 528 (1996); United States v. Rich, 992 F.2d 502, 505 (5th Cir. 1993). Because the facts are essentially uncontroverted *1189 and the credibility of witnesses is not at issue in the instant case, we will review the trial court's decision de novo. See People v. Foskey, 136 Ill.2d 66, 76, 143 Ill. Dec. 257, 262, 554 N.E.2d 192, 197 (1990).
The defendant contends that the trial court erred in denying his motion to suppress evidence seized during the search of his rented U-Haul truck. He does not raise issue with the voluntariness of his consensual response to Buysse's request to "take a look" inside the back of the U-Haul. Rather, the defendant argues that Buysse's actions exceeded the scope of his consent because he only agreed to permit Buysse to look inside the back of the truck to confirm that it contained the defendant's personal items. He contends that he did not consent to Buysse entering the truck, moving his personal belongings around, and opening boxes or taped objects found in boxes.
The fourth amendment of the United States Constitution and article I, section 6 of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const.1970, art. I, § 6. The fundamental purpose of these provisions is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. See People v. Dilworth, 169 Ill.2d 195, 201, 214 Ill.Dec. 456, 460, 661 N.E.2d 310, 314 (1996). It is well settled, however, that an individual may consent to a search conducted without a warrant, thereby eliminating the need for probable cause and a search warrant. People v. Phillips, 264 Ill.App.3d 213, 217, 201 Ill.Dec. 686, 689, 636 N.E.2d 1118, 1121 (1994).
When the police rely upon consent as the basis for a warrantless search, they have no more authority than they have apparently been given by the voluntary consent of the defendant. W. LaFave, Search & Seizure, § 8.1(c), at 610 (3d ed.1996). The scope of their authority is not determined based on the subjective intentions of the consenting party nor the subjective interpretation of the searching officer. W. LaFave, Search & Seizure,§ 8.1(c), at 610 (3d ed.1996). Rather, the standard for measuring the scope of a suspect's consent is that of "objective reasonableness," which requires consideration of what a "typical reasonable person [would] have understood by the exchange between the officer and the suspect." Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297, 302 (1991).
In most instances, this determination is easily made because courts ordinarily define the scope of a search by the express object or purpose. Jimeno, 500 U.S. at 251, 111 S.Ct. at 1804,114 L.Ed.2d at 303. By stating the intended object of the search either directly or by revealing a suspicion of specific criminal activity, a police officer not only apprises the suspect that his constitutional rights are being impacted, but he also informs the suspect of the reasonable parameters of his inquiry. For that reason, courts have determined that an officer may search smaller containers found inside the larger area being searched if it would be objectively reasonable to find the stated object of the search in that smaller container. See Jimeno, 500 U.S. at 251, 111 S.Ct. at 1804, 114 L.Ed.2d at 302-03 (defendant's consent to search his car included search of a small paper bag found in the car because he was informed that the officer suspected that he possessed narcotics); Phillips, 264 Ill.App.3d at 222, 201 Ill.Dec. at 692, 636 N.E.2d at 1124 (defendant's consent to search of his motorcycle included search of a jacket located in the rear cargo area when the express object of the search was narcotics); United States v. Lechuga, 925 F.2d 1035, 1042 (7th Cir. 1991) (consent to search unfurnished apartment included search of suitcase in closet because the express purpose of the search was drugs); Rich, 992 F.2d at 506-07 (defendant's consent to the officer's request to look in his truck included suitcase located behind the passenger seat because the officer had just asked the defendant if he had any narcotics in the truck).
The search in the instant case is problematic, however, because the record reveals that Buysse did not express any specific purpose for his request to "take a look" in the back of the U-Haul truck. Further, our research has uncovered no authority directly on point. Therefore, we must consider the totality of the circumstances surrounding the exchange between the defendant and Buysse *1190 to determine whether a typical reasonable person would have believed that the scope of the defendant's consent included permission for the officer to search the contents of unopened boxes not in plain view in the cargo hold of the truck and to cut open the sealed objects found inside those boxes.
We acknowledge that it is not necessary for a police officer to specifically use the term "search" to constitute a valid search request under the fourth amendment. Rich, 992 F.2d at 506. However, the words used by the officer, when viewed in context, must objectively communicate to a reasonable individual that the officer is requesting permission to examine the vehicle and its contents. Rich, 992 F.2d at 506. After our careful review of the facts in the instant case, we determine that Buysse's actions exceeded the scope of the defendant's consent.
Just prior to making the request to "take a look," Buysse had asked the defendant where he was going and what he had in the back of his truck. The defendant explained that all of his personal belongings were in the cargo hold of the truck because he was moving to Detroit to start a new job. Buysse immediately followed the defendant's explanation with the question: "can I take a look?" We determine that the defendant's affirmative response, "sure," reasonably communicated to Buysse consent only to look into the truck to see if it contained what the defendant claimed it did, his personal belongings. At no time did Buysse inform the defendant that he wanted to search for illegal drugs or other contraband. Therefore, Buysse failed to reasonably communicate to the defendant that he intended to conduct a thorough search of the cargo hold of the defendant's U-Haul. Upon opening the door of the cargo hold and seeing that it contained what the defendant claimed, Buysse, having no probable cause, was obligated to obtain additional consent if he wished to investigate beyond the implied object of the search.
The State points out that the squad car in which the defendant was sitting was located only two or three car lengths behind the U-Haul. Therefore, the State contends that because the defendant did not object when the officer entered the truck, moved the contents around, and opened boxes and packages, the defendant's consent was a "general consent." See United States v. Verduzco, 996 F.2d 1220 (7th Cir.1993), citing United States v. Pena, 920 F.2d 1509 (10th Cir.1990). Consequently, the State argues that the scope of the search was unlimited. We disagree. Although a defendant has the right to place explicit limitations on the scope of his consent (Jimeno, 500 U.S. at 252, 111 S.Ct. at 1804, 114 L.Ed.2d at 303) as well as the right to withdraw it before any incriminating evidence is found (U.S. v. Dyer, 784 F.2d 812, 816 (7th Cir.1986)), police officers remain constrained by the bounds of reasonableness in conducting their searches. See United States v. Harris, 928 F.2d 1113 (11th Cir.1991). We decline to find that the defendant's failure to exit the squad car and object once Buysse exceeded the scope of his authority served to transform his limited consent to a general consent to search.
We hold that an objectively reasonable person would have understood the exchange between Buysse and the defendant to mean simply that the defendant consented to Buysse looking into the back of the truck to confirm that it contained the defendant's furniture and other personal belongings. Because Buysse's search exceeded the scope of the defendant's consent, we reverse the trial court's ruling denying the defendant's motion to suppress. Further, because the State cannot prevail on remand without the evidence that we have held should have been suppressed, we reverse the defendant's conviction and sentence outright. People v. Sweborg, 293 Ill.App.3d 298, 305, 227 Ill.Dec. 807, 688 N.E.2d 144, 149 (1997). The remaining issues raised by the defendant are rendered moot by our decision.

CONCLUSION
For the foregoing reasons, the judgment of the circuit court of Henry County is reversed.
Judgment reversed.
LYTTON, J., and McCUSKEY, P.J., concur.