(No. 63970

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWARD E. JOHNSON, Appellant.

*Opinion filed December 21, 1987.*

Daniel M. Kirwan, Deputy Defender, and Dan W. Evers, Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

No appearance for the People.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Edward E. Johnson, was charged in St. Clair County with the offense of aggravated indecent liberties with a child. (Ill. Rev. Stat. 1983, ch. 38, par. 11—4.1.) At his trial, the testimony of the five-year-old complaining witness and her seven-year-old brother was recorded on videotape for presentation to the jury. The defendant was not present in the courtroom when the complaining witness' testimony was recorded. He was ultimately found guilty as charged. The appellate court affirmed the defendant's conviction, with one justice dissenting, rejecting his assorted challenges to the videotaping procedure and its use. (146 Ill. App. 3d 640.) We granted the defendant's petition for leave to appeal.

The victim, five-year-old Danielle Willis, resided with her mother, the defendant (her mother's husband) and her two brothers, Michael and Averil, in an apartment in East St. Louis. Mrs. Johnson testified that on the morning of June 26, 1984, she left the apartment early for a doctor's appointment. When she returned at approximately 9:45 a.m., she was met at the door by the defendant, who asked her what to do about bleeding. Danielle was sitting on the toilet, and the bowl was full of blood. When asked who caused her injury, Danielle replied, "It was 'man.' " Danielle also indicated that she knew who the person was, but did not further identify him at that point.

The defendant told Mrs. Johnson that he had been asleep until being awakened by the sound of Danielle crying in the bathroom. Mrs. Johnson started for the

back door, thinking that "man" might be the upstairs neighbor, Robert Lewis, or his eight-year-old son, Emmanuel, whose nickname was "Man." The back door of the Johnson's apartment led to a storage room which was also accessible to the apartment upstairs. That back door, which had been locked when Mrs. Johnson left the apartment earlier, was now unlocked. Both Robert and Emmanuel Lewis testified and denied involvement. Other testimony established that Robert Lewis had borrowed tools from the defendant at the back door sometime between 7 and 7:30 a.m. The defendant testified that he relocked the back door after giving Mr. Lewis the tools.

Danielle was taken to the hospital, where an examination revealed external and internal injuries to her genitalia. The injuries were consistent with the insertion of an adult penis.

The circumstances of Danielle's eventual identification of the defendant as her assailant are not entirely clear from the record. On June 27, the day after the incident, Danielle's aunt, Mary Chappel, came from Chicago to visit the child. Ms. Chappel testified that during a conversation in Danielle's hospital room, with no one else present, Danielle told her that "Edward did it." However, the aunt did not report this disclosure to the police, but testified that she did inform Mrs. Johnson. In her testimony, Mrs. Johnson made no mention of having been so informed. She stated that she was told about Edward by Danielle herself, and that this occurred a "good while after" the incident. No exact date was testified to.

A police officer testified that he visited Danielle in the hospital each day after the incident, but she did not give a statement. While the record is again unclear, it appears that the police were notified of the defendant's involvement only after Danielle spoke to a social worker

on July 2, about a week after the incident. The social worker testified that Danielle named Edward as her assailant at that time.

In any event, Danielle was released from the hospital on July 3, and an officer went to the apartment on that day. According to the officer, Danielle and her aunt, Mary Chappel, had a conversation about the incident while the officer listened in the next room. According to the officer's contemporaneous report, Ms. Chappel used dolls to have Danielle demonstrate what happened. She then questioned Danielle along the lines of, "What did Edward do to you?"

This rendition of events contradicts Ms. Chappel's version. She testified that she did not ask any questions and that Danielle "volunteered" the statements implicating the defendant.

We have related these events in some detail in order to place the children's videotaped testimony in necessary perspective. As should be obvious, the evidence independent of their testimony was conflicting and unclear. While there can be no doubt that someone committed a loathsome offense against the child, the question is whether the defendant was in fact the offender. The defense theory was that Danielle was coached or coerced into naming the defendant by the repeated suggestions of her aunt and perhaps others.

Against this backdrop, we turn to the circumstances surrounding the videotaping of Danielle's and Michael's testimony. Prior to trial, a hearing was held to determine the competency of both children to testify. Danielle was examined first and, according to the transcript, failed to give an audible response to any of the prosecutor's questions. A later attempt to question Danielle elicited a few audible responses, but the majority of questions were met with no response at all, or were answered by nodding or shaking of her head. Michael was more verbal by

comparison, but he often resorted to nodding or was nonresponsive. The trial court found Michael competent to testify, but reserved its ruling on Danielle until after her testimony. The court also, *sua sponte* and over the defendant's objection, ordered that both children's testimony be recorded on videotape with the jury and spectators removed from the courtroom.

The next day, after opening arguments, Danielle began testifying, which was recorded on the videotape. She gave audible answers to some preliminary questions, but when the questioning turned to the day she "got hurt" she ceased speaking. She was asked repeatedly who came into her room but would not respond. Finally, the prosecutor requested a recess, asserting that Danielle was "frightened to death." The prosecutor then moved that the defendant be removed from the courtroom during Danielle's testimony. Defense counsel objected, arguing that the defendant had made no remarks or gestures to influence the child, but the trial court granted the motion. The court ordered that the defendant be placed in a control room where he could view the testimony on a video monitor, that he be provided a note pad on which to take notes during the testimony, and that he be granted a recess prior to cross-examination during which he could confer with his attorney.

When Danielle resumed testifying, she was initially more verbal and responsive. In response to questioning, she stated that "Edward" committed the offense against her. Her responsiveness quickly deteriorated, however, and she eventually reverted to the reticent behavior she had exhibited earlier.

Her level of responsiveness became even lower on cross-examination and redirect examination. She was almost entirely nonverbal, if she responded at all, and she occasionally indicated her assent to completely contradic-

tory questions. The following exchange provides the best example:

"Q. [Mr. Hanks, Assistant State's Attorney]: Did [Aunt] Mary tell you to tell a lie on Eddie?

A. (Nodding.)

Q. Did she? Huh?

A. (Nodding.)

Q. Did Mary tell you to make all this up and lie about Eddie?

A. Yes.

Q. Are you making it all up?

A. Yes.

Q. And Eddie didn't do this to you at all? (Pause.) Danielle, would you sit back down in the chair, please. Did Eddie do this to you?

A. (Nodding.)

Q. What is your answer?

A. Yes."

Michael's testimony was given with the defendant in the courtroom. It was somewhat more satisfactory, but he, too, lapsed into frequent nonresponsiveness. He testified that he saw the defendant and Danielle on her mother's bed and, using dolls, demonstrated that sexual contact appeared to be taking place. Cross-examination established that immediately after the incident Michael was taken to Chicago by his aunt and spent the next several days there.

The videotapes were black and white, and the witnesses were shown in close-up. The judge, other court personnel and other persons in the courtroom (including the defendant during Michael's testimony) could not be seen. The attorneys' voices could be heard, but they were ordinarily outside the picture except for occasions when they stood immediately in front of the witness stand. The overall photograph quality of the tapes was less than crystal clear.

The defendant raises two distinct challenges to the videotaping procedure employed at his trial. He alleges that the videotaping in general was improper, and also submits that his exclusion from the courtroom violated his sixth amendment right to confrontation and assistance of counsel, as well as the Illinois statute governing testimony of minor victims in sex offense cases (Ill. Rev. Stat. 1983, ch. 38, par. 115—11). While we do not reach all of these contentions, we agree that the use of the videotaped testimony was improper and remand for a new trial.

In affirming the decision of the trial court, the appellate court found authority for the videotaping procedure in Supreme Court Rules 414 and 206(f) (87 Ill. 2d Rules 414, 206(f)). Rule 414 provides, in pertinent part:

"Rule 414. Evidence Depositions

(a) If it appears to the court in which a criminal charge is pending that the deposition of any person other than the defendant is necessary for the preservation of relevant testimony because of the substantial possibility it would be unavailable at the time of hearing or trial, the court may, upon motion and notice to both parties and their counsel, order the taking of such person's deposition under oral examination or written questions for use as evidence at a hearing or trial.

(b) The taking of depositions shall be in accordance with rules providing for the taking of depositions in civil cases, and the order for the taking of a deposition may provide that any designated books, papers, documents or tangible objects, not privileged, be produced at the same time and place."

Rule 206(f) specifies the procedures for videotaped depositions.

In *People v. Zehr* (1984), 103 Ill. 2d 472, we held that the decision to permit the use of videotaped, as opposed to transcribed, depositions was within the trial court's discretion, and we continue to hold to that view. How-

ever, that exercise of discretion presupposes that the Rule 414 standards for the utilization of *any* deposition as evidence have been satisfied. In our opinion, the Rule 414(a) threshold showing has not been met in this case in that the testimony of Danielle and Michael was not shown to be "unavailable" in the sense contemplated by the rule.

The appellate court gave the term "unavailable" an interpretation broad enough to encompass the circumstances of this case. According to the appellate court, the testimony of the children was unavailable because the trial court believed they would be fearful, if not completely unable, to speak in front of the jury and others in the courtroom. In other words, the appellate court equated *reluctance* to testify with *unavailability* of testimony. This interpretation conflicts with the intent underlying Rule 414, as well as the construction given the term "unavailable" in other contexts.

Rule 414 was intended to strike a balance between the need to obtain and preserve evidence, and a criminal defendant's right to have the witnesses against him appear before the jury, who may observe the witnesses' demeanor and judge their credibility. (U.S. Const. amend. VI; Ill. Const. 1970, art. I, §8.) A lengthy discourse on the confrontation clause of the sixth amendment is unnecessary to resolve the issue presented; it is sufficient to state the basic rule that face-to-face live testimony is to be the rule, and that any exception must be narrowly drawn and predicated on a showing of special need. (See *Barber v. Page* (1968), 390 U.S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318.) The "unavailable witness" problem is one such special circumstance.

These balancing considerations are also reflected in the legal rules governing the admissibility of certain hearsay evidence. For example, Rule 804 of the Federal Rules of Evidence provides that certain hearsay is not

inadmissible if the declarant is unavailable as a witness. The rule includes the following:

"(a) Definition of unavailability.—'Unavailability as a witness' includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement; or

(2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of his statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision (b) (2), (3), or (4), his attendance or testimony) by process or other reasonable means.

A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying."

While we do not necessarily adopt Rule 804 as an exhaustive definition of "unavailable" under Illinois law, we do embrace the general principles reflected therein. The general thrust of the rule makes clear that "unavailability" is a narrow concept, subject to a rigorous standard. The reasons for unavailability which are acceptable under Federal Rule 804—privilege, persistent contemptuous refusal to testify, failure of memory, death or illness, etc.—are substantial and therefore legally cognizable.

As we see it, the mere *unwillingness* of an otherwise available witness to testify simply does not rise to the high level of the Federal Rule 804 standards. Hence, it cannot constitute excusable unavailability for purposes of

our Rule 414. The reasons for this view should be obvious. There is no question that testifying in open court can be a difficult experience, especially for victims of serious crimes. However, our legal system makes public testimony in front of the fact finder an important element of the truth-seeking process. Any departure from this preference must be based upon a showing of special need. It follows that a witness' mere reluctance to testify cannot be accepted as a good enough reason to permit the use of out-of-court testimony.

Having said that, we feel compelled to acknowledge the special difficulties presented by cases such as these, where the witness in question is a young child whose fear and reticence is probably nonvolitional and hence understandable. However, it is our view that any attempts to resolve these difficulties must be initiated by the legislature. In fact, one such step has already been taken. Section 115—11 of the Code of Criminal Procedure provides that in certain criminal prosecutions, where the victim is a minor under 13 years of age, the *court may exclude disinterested persons, except the media, from the courtroom.* Ill. Rev. Stat. 1985, ch. 38, par. 115—11.

Another legislative development which occurred while this case was under advisement merits some discussion, especially in light of the fact that this case is to be tried again. During the recent override session of the General Assembly, both the House and the Senate voted to override the Governor's veto of House Bill No. 510, which provides for the use of videotaped testimony in cases such as this one. The pertinent section of the new bill provides:

> "§106A—2. (a) Upon motion of the State at any time before the trial of the defendant begins, the court may order that a child's oral statement or testimony be recorded. The recording shall be made in the presence of

the court, the attorneys for the defendant and for the prosecution and, in addition, may be made in the presence of the operator of the recording equipment, necessary security personnel, and any person who, in the court's discretion would contribute to the welfare and well-being of the child. *The defendant shall be permitted to be present at the making of the recording.* Only the attorney for the prosecution or the court may question the child. The court shall rule on evidentiary objections of the attorney for the defendant.

(b) The recording, or portions of the recording, may be admissible into evidence upon motion of either the State or the defendant ***." (Emphasis added.)

This bill, if applicable, would seem to provide general authorization for videotaping of testimony. However, we need not decide the question of the bill's retroactive application to this case, because the procedure employed here does not comply with the bill's requirements.

As the italicized language above indicates, the bill provides that the defendant shall be permitted to be present at the making of the videotape. In this case, of course, the defendant was removed from the courtroom during the taping of Danielle's testimony. Therefore, even if the new bill were to apply, its requirements were not met, and this case would still require remand for a new trial. If a videotaping procedure is to be employed again at that new trial, it should be conducted in accordance with the bill's requirements. That statement notwithstanding, we express no opinion as to the bill's constitutionality.

This is an extremely difficult case. The crime that was committed is indescribably loathsome. The witness was understandably reluctant to testify, and the trial judge understandably attempted to overcome that reluctance by permitting Danielle to testify outside the presence of the public, the jury, and the defendant.

512

However, the equivocal nature of Danielle's testimony simply raises more questions than it answers, and thereby illustrates why departures from traditional trial procedures must be employed cautiously. It is entirely possible that utilization of the videotaping procedure enabled Danielle to testify truthfully as to the charges against the defendant. However, it is also possible that the procedure removed her reluctance to testify falsely, and enabled her to mouth the charges that others may have encouraged her to make.

For the reasons above stated, the judgments of the circuit court of St. Clair County and of the appellate court are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*