THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHAD E. WHEELER, Defendant-Appellant.

Fourth District   No. 4—97—0037

Argued July 16, 1998.—Opinion filed September 28, 1998.

Daniel D. Yuhas and Duane E. Schuster (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

After a trial by jury in the circuit court of McLean County, defendant Chad E. Wheeler was convicted in November 1996 of one count of first degree murder (720 ILCS 5/9—1(a) (West Supp. 1995)) and two counts of aggravated battery to a child (720 ILCS 5/12—4.3(a) (West 1996)). The victim of these offenses was defendant's impaired three-month-old son, Levi Michael Wheeler. The court vacated the aggravated battery conviction and sentenced defendant to natural life in prison for the murder pursuant to section 5—8—1(a)(1)(c)(ii) of the Unified Code of Corrections (Code) (730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1996)).

Defendant has appealed, contending (1) the proof did not support

the verdict; (2) resentencing is required because the statute under which the sentence was imposed was invalid; (3) the court erred in refusing the jury's request for a transcript of defendant's testimony; (4) the prosecution's opening statement and closing argument were improper; (5) the court abused its discretion in allowing, over defense objection, a police detective who was a witness to remain at the counsel table; and (6) the court denied defendant his right to due process when it refused to explain to the jury the meaning of the term "reasonable doubt." We affirm.

The evidence indicated (1) Levi was born to defendant and Shannon R. Gibson in October 1995; (2) Levi weighed only 1 pound 15 ounces at birth; (3) when Levi left the hospital in January 1996, he weighed approximately five pounds and suffered from sleep apnea, which could cause the baby to stop breathing while asleep; (4) as a result of the apnea, the baby's parents were instructed to and did attach an apnea monitor to the child's body when they went to sleep; and (5) the monitor sounded an alarm whenever the heartbeat or breathing reached the levels of danger.

The evidence also indicated the following: (1) shortly after Levi went home, Levi's parents returned him to the hospital when the apnea's monitor alarm went off; (2) hospital testing indicated Levi was developing normally so he was sent home; (3) at 2 a.m. on February 2, 1996, Jeffrey Emmert, an emergency medical technician of the Bloomington fire department, was sent to Levi's house because Levi had reportedly stopped breathing; (4) when Emmert arrived at defendant's house, defendant was in the living room holding Levi, whereupon Emmert checked the child's pulse and breathing and found neither to be functioning; and (5) Emmert then applied cardiopulmonary resuscitation (CPR) to the child and got the child breathing and his pulse returned.

Paramedics Lorinda Ausili and Walter Rudy apparently arrived on the scene as the child's pulse and breathing returned. Ausili testified she noticed an old scar on Levi's abdomen and bruises on his face. Rudy also testified to seeing those bruises. Rudy testified defendant then stated "we're not child abuser's [sic]" and that his (defendant's) pit bull dog had caused the injuries. Apparently the paramedics inserted a breathing tube into Levi's trachea and attached a heart monitor, and Levi was transported to BroMenn hospital locally and then taken by helicopter to St. Francis Medical Center in Peoria. Levi remained at St. Francis in a chronic vegetative state for three months. On May 3, 1996, he was transferred to a facility in Sycamore and died there on May 26, 1996.

Dr. Jacqueline Nehama admitted Levi into St. Francis Medical

Center. Dr. Nehama testified that she noted a bruise above Levi's right eye, an older bruise under his left eye, and bruises around his temple and behind his ear. Levi also had bruises on his chest and a large scar on his abdomen. Based on Levi's condition, Dr. Nehama formed two possible diagnoses: nonaccidental trauma or a serious infection. Tests did not locate an infection; rather, they revealed that Levi was bleeding in his brain. Dr. Nehama concluded that Levi's injuries resulted from being severely shaken.

Dr. Nehama consulted with defendant and Gibson to develop a medical history. Defendant and Gibson told Dr. Nehama that Levi was bruised by the family pit bull a few days earlier when the dog ran over Levi and jumped on him. Also, Levi had surgery for a bowel problem, which left a large scar on his abdomen. Levi had been running a low-grade fever for a few days prior to being admitted to St. Francis Hospital, but appeared to be improving.

Dr. Terry Furguile, the director of the pediatric intensive care unit at St. Francis Medical Center, also treated Levi. Dr. Furguile noted the bruises on Levi's body and found a soft spot on top of Levi's head that was full and dense, a condition that is never normal. Testing and X rays revealed blood in Levi's brain, fractured ribs, and fractures in his legs and arm. One of the fractures in his leg was a spiral fracture associated with forceful twisting. Also, an ophthalmologist found bleeding behind Levi's right eye. Based on this evidence, Dr. Furguile concluded that Levi had suffered multiple traumatic injuries most likely caused by violent shaking.

Dr. Furguile stated that Levi's broken ribs were not consistent with an improper attempt to perform CPR; rather, they were more consistent with abuse. He acknowledged that Levi's bruises could have been caused by thrombocytopenia, a blood condition that makes infants susceptible to bruising. Levi was born with this condition, but no longer suffered from this disorder. Dr. Furguile also acknowledged that Levi's broken bones could have been caused by osteogenesis imperfecta, a genetic disease that makes bones brittle.

Dr. Furguile stated that fractures in a three-month-old infant are extremely rare and require great force to inflict. Thus, he concluded that Levi's injuries were not inflicted by the family dog; rather, he was a battered child. Dr. Furguile testified that battered child syndrome was a more severe form of shaken baby syndrome that results in internal bleeding due to violent shaking in conjunction with fractures and external bruising.

Dr. Paul Cruse, a neurologist at St. Francis Medical Center, testified he spoke with defendant concerning Levi's injuries and defendant told him his pit bull dog jumped on Levi a few days before Levi was

admitted to the hospital and this caused Levi's injuries. Cruse reviewed the medical evidence and diagnosed Levi with brain injuries consistent with shaken baby syndrome. Based on Levi's other injuries, Dr. Cruse concluded Levi's injuries were not consistent with a dog attack; rather, Levi was a battered child.

Dr. John Patrick Rhode, an ophthalmologist who treated Levi in February 1996, testified that Levi had large pockets of bleeding in his eyes. Dr. Rhode concluded that Levi's injuries were most likely caused by vigorous shaking.

Paul Park, a chaplain in the pediatric unit at St. Francis Medical Center, testified he met with defendant and Gibson the day Levi was admitted. According to the chaplain, defendant reiterated the story regarding the pit bull jumping on Levi and causing his external injuries. The chaplain then explained that he met with those parents the following Sunday and they told him their previous explanation was untrue. The chaplain said defendant then contended (1) a few nights before the night in question, Levi's apnea alarm sounded; (2) defendant brought Levi into the family room and then went to the kitchen to warm a bottle and have a cigarette; (3) when defendant returned, Levi was on the floor and the pit bull was on top of him; and (4) Levi did not appear injured, so defendant fed him.

Dr. Violette Hnilica, a forensic pathologist, performed the autopsy on Levi. Dr. Hnilica noted that Levi had acute pneumonia and several other diseases resulting from premature birth. Levi's brain was totally scarred with several areas of hemorrhaging. His brain was also shrunken, weighing less than 40% its normal weight, and he had scars in his eyes from retinal hemorrhages. Dr. Hnilica testified that shaking or hitting the head could have caused the injuries to Levi's brain and eyes. Further, she stated that Levi did not have thrombocytopenia or osteogenesis imperfecta. She concluded that Levi's death was consistent with battered child syndrome.

Dr. Larry Bush, the director of the infant apnea center for St. Francis Medical Center, testified that based on the data from Levi's apnea monitor, many real episodes of apnea and low heart rate occurred while Levi was living with his parents. Dr. Bush also stated that defendant and Gibson were informed that they did not have to attach the monitor when Levi was awake. The only exception was when Levi was left unattended. Further, he stated that apnea monitors were commonly used for premature babies.

Dr. Bush testified that on February 2, 1996, the monitor was shut off at 12:37 a.m. and turned back on at 1:34 a.m. At 2 and 2:02 a.m., the monitor's alarm sounded because Levi's heart rate was very slow. Thereafter, the monitor was turned off and on several times. At 2:12

a.m., the monitor sounded an alarm because Levi stopped breathing regularly. This was followed by multiple alarms for a very low heart rate until the monitor was shut off at 2:25 a.m. During this time frame, Dr. Bush noted a seven-second interval when someone administered CPR compressions on Levi.

Detective John Katz testified he assisted in the arrest of defendant in Hannibal, Missouri, and transporting defendant back to McLean County. According to Katz, after he gave defendant *Miranda* warnings, defendant (1) denied shaking Levi on the night of his injury; (2) admitted he could have picked Levi up in a dangerous way; (3) when asked if he had ever picked Levi in a way likely to cause bruising, responded "anything is possible" and that he blacked out; and (4) stated "blacking out" meant he forgot how to perform CPR.

Dr. Panos Lymberopoulos, a physician with a specialty in pathology, testified for the defense. Dr. Lymberopoulos testified that Levi had thrombocytopenia, which could have caused Levi to bruise more easily than the average infant. Further, thrombocytopenia could have caused the retinal and cranial hemorrhages. Dr. Lymberopoulos opined that Levi's bones were more fragile than those of an average infant because of the abdominal surgery's effect on his body's ability to absorb calcium.

Gibson testified (1) on the night Levi was injured, she went to bed around midnight, at which time Levi appeared to be in good shape; (2) defendant woke her and told her Levi was not breathing; (3) she called 911 but did not remember seeing defendant perform CPR on Levi; (4) she did not know the extent of Levi's injuries until she arrived at Bro-Menn Hospital; (5) she did not injure Levi and did not know who did; and (6) defendant told her if he did shake Levi, he did not remember doing it.

Defendant testified to the following. He noticed red marks on Levi's face on January 29, 1996. Gibson then informed defendant that Levi had been picking at his eyes. On January 31, 1996, Levi began crying during the middle of the night. Defendant brought Levi into the living room and went to the kitchen to warm a bottle and smoke a cigarette. When he returned to the living room, Levi was on the floor and the pit bull was pawing at him. Defendant observed a scratch on Levi's cheek and leg. The next day, Levi's jaw was swollen, his nose congested, and he had a fever but after defendant gave Levi some Children's Tylenol, he appeared to be getting better.

Defendant finally stated that (1) on February 2, 1996, Levi's monitor awakened him; (2) he then checked Levi and found he had no pulse and was not breathing; (3) he then disconnected the monitor and started CPR; (4) Levi began to have a pulse and defendant became

confused as to whether to continue CPR, so he awoke Gibson and she called 911; and (5) he then picked up Levi and held him until the ambulance came. Defendant explained he went to Hannibal, Missouri, after Levi died because a detective had indicated to him that if Levi died, he would consider the death a homicide. Defendant also said he did not intend to hurt Levi while performing CPR and if he shook him, he did not remember doing it.

■ We conclude the evidence supported the verdict of guilty of first degree murder. The State was required to prove beyond a reasonable doubt that defendant intended to kill or do great bodily harm to Levi or that the acts he committed were such that he knew they would cause Levi's death or that they created a strong probability of death or great bodily harm to Levi. See 720 ILCS 5/9—1(a)(1), (a)(2) (West Supp. 1995). To uphold this verdict we must be able to conclude that after viewing all the evidence in the light most favorable to the State a rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt. *People v. Oaks*, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996); *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985).

■ Here, the evidence indicated defendant and Gibson were the only persons around Levi for any extended period near the episode of the night of February 2, 1995. No evidence indicated that Gibson handled Levi in such a way that would have caused the injuries revealed by the autopsy. Only defendant was shown to have been awake at the time of the occurrence on February 2, 1995, giving rise to Levi being sent to BroMenn Hospital. Levi was known to be somewhat impaired but not the extent shown by the autopsy. Defendant admitted to handling Levi with some force in performing CPR, but the evidence of injury to Levi indicated he had injuries far beyond those which could have resulted from administration of CPR.

Based on the testimony of the various physicians, the jury could have concluded beyond a reasonable doubt that the pit bull dog did not inflict the fatal injuries. The jury could have reached a similar conclusion that defendant was not telling the truth as to what happened when Levi was injured. The physicians' testimony negates defendant's explanation, and his changing his story and the likelihood that his explanation was false are indications of a guilty mind. The jury could have determined beyond a reasonable doubt that defendant inflicted severe injury upon Levi on February 2, 1996, and that the injuries inflicted were such that a person inflicting them would realize they were likely to cause great bodily harm.

■ Defendant's sentence of imprisonment for his natural life was imposed pursuant to section 5—8—1(a)(1)(c)(ii) of the Code (730 ILCS

5/5—8—1(a)(1)(c)(ii) (West 1996)). It makes such a sentence mandatory when the death sentence is not used and where, as here, the victim was under 12 years of age and the perpetrator 17 years or older. Defendant maintains the foregoing legislation is invalid because it violates (1) the "single subject rule" of article IV, section 8, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 8); (2) the command of article I, section 11, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11), which provides for proportionate penalties with the objective of restoring the offender to useful citizenship as a consideration in sentencing; and (3) due process (Ill. Const. 1970, art. I, § 2).

We consider the "single subject rule" first.

■ Article IV, section 8(d), of the Illinois Constitution of 1970 provides "[b]ills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, § 8(d). In *Johnson v. Edgar*, 176 Ill. 2d 499, 680 N.E.2d 1372 (1997), the Supreme Court of Illinois recently held that Public Act 89—428 (Pub. Act 89—428, eff. December 13, 1995 (1995 Ill. Laws 4453)) violated the "single subject rule" of the foregoing constitutional provision because it concerned subjects as discordant to one another as an environmental impact fee and sentencing in certain criminal cases.

More recently in *People v. Pitts*, 295 Ill. App. 3d 182, 691 N.E.2d 1174 (1998), this court remanded for resentencing in sentences imposed for attempt (first degree murder) (720 ILCS 5/8—4(a), 9—1(a) (West 1994)) and armed robbery (720 ILCS 5/18—2(a) (West 1994)). These sentences were imposed under the terms of section 3—6—3(a)(2) of the Code (730 ILCS 5/3—6—3(a)(2) (West 1994)), purportedly amended under the terms of Public Act 89—404 (Pub. Act 89—404, § 40, eff. August 20, 1995 (1995 Ill. Laws 4306, 4323-27)), which contained "truth-in-sentencing" provisions and which would require that defendant serve 85% of his sentence rather than receive a credit against his sentence of one day for each day of good conduct while imprisoned as previously provided by section 3—6—3(a)(2) of the Code (730 ILCS 5/3—6—3(a)(2) (West 1994)). This court pointed out that 9 of the 10 sections of Public Act 89—404 concerned law enforcement and were not discordant but that one other section was. It concerned a mechanism by which nonprofit hospitals or those operated by local government may obtain liens for services performed (Pub. Act 89—404, § 50, eff. August 20, 1995 (1995 Ill. Laws 4306, 4336-37)).

In *Pitts*, the circuit court had pronounced that Public Act 89—404 was applicable and that defendant would have to serve 85% of his sentence rather be eligible for day-for-day credit. As this court

deemed Public Act 89—404 was invalid because of the discordant subjects it covered, it remanded for resentencing with a proper statement of possible sentence credit.

■ We do not agree with defendant that section 5—8—1(a)(1)(c)(ii) of the Code is subject to the same claim of invalidity as was the provision involved in *Pitts*. Section 5—8—1(a)(1)(c)(ii) of the Code requiring imposition of a sentence of natural life arises from Public Act 89—203, which contains eight sections. Seven of those sections are clearly related to law enforcement. The instant dispute arises from the eighth section. It concerns the Illinois Mortgage Foreclosure Law (the Foreclosure Law) (735 ILCS 5/15—1101 *et seq.* (West 1996)).

Our reasoning that inclusion of this amendment to the Foreclosure Law differs from the inclusion of the provision concerning hospital liens in *Pitts* begins with the decision in *Rembert v. Sheahan*, 62 F.3d 937 (7th Cir. 1995). There, suit had been brought in the Federal District Court for the Northern District of Illinois, against the sheriff of Cook County, to enjoin the procedure he was using in evicting those in possession of real estate upon which a mortgage had been foreclosed. The district court enjoined the sheriff to cease enforcing orders of possession against tenants when they were not named personally or generically. The seventh circuit vacated the order and remanded to the district court to determine whether the sheriff was still enforcing orders against tenants who were named only by a class of people and not personally. The opinion noted "[t]he Sheriff is an integral part of the State machinery that allows purchasers of mortgaged real estate to take possession of that real estate." *Rembert*, 62 F.3d at 741 n.1.

Public Act 89—203 amended sections 15—1508 and 15—1701 of the Foreclosure Law (735 ILCS 5/15—1508, 15—1701 (West 1996)) in such a way that orders of possession cannot be entered against persons who are not personally, rather than generically, named in the original petition for foreclosure unless a supplemental petition so naming them has been filed. This legislation was apparently enacted in response to *Rembert*, as it protected the possessory rights to real estate of people not properly named in the petition to foreclose.

The *Johnson* court indicated "a natural and logical connection" between various pieces of legislation is required to avoid discordance but that a broad interpretation should be given to each. *Johnson*, 176 Ill. 2d at 515, 680 N.E.2d at 1379. The discordant legislation in *Pitts* concerned hospital liens and the allegedly discordant legislation concerns mortgage foreclosure. However, giving a broad interpretation to the amendments to the Foreclosure Law here and considering the focus this legislation places on the sheriff and his deputies, who are law enforcement officers, in regard to their serving of notices and

writs of possession only on properly designated parties to the foreclosure proceeding, we conclude this portion of Public Act 89—203 has "a natural and logical connection" to the rest of the act.

We also hold that section 5—8—1(a)(1) of the Code violates neither the required consideration of restoring the offender to useful citizenship nor due process. Article I, section 11, of the Illinois Constitution of 1970 provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. However, this constitutional command only justifies the court's interference when the punishment is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. *People v. Farmer*, 165 Ill. 2d 194, 210, 650 N.E.2d 1006, 1014 (1995).

In *People v. Taylor*, 102 Ill. 2d 201, 464 N.E.2d 1059 (1984), the Supreme Court of Illinois held article I, section 11, of the Illinois Constitution did not invalidate the requirement in section 5—8—1(a)(1)(c) of the Code (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c)) providing for mandatory natural life sentence for a second murder. That court stated article I, section 11, "does not prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigating circumstances could allow a proper penalty of less than natural life." *Taylor*, 102 Ill. 2d at 206, 464 N.E.2d at 1062. The legislature validly could have made the same determination in regard to a single murder of a young child as was made in regard to a repeat murderer.

The public policy of severe penalties for the murder of young children, to protect that category of persons, is also a rational basis for providing for mandatory natural life sentence for such offenders. Accordingly, the legislation meets due process muster. See *People v. Arna*, 168 Ill. 2d 107, 114, 658 N.E.2d 445, 449 (1995); *Farmer*, 165 Ill. 2d at 207-08, 650 N.E.2d at 1013.

■ No error resulted from the trial court's refusal to grant the jury a transcript of defendant's testimony. In *People v. Davis*, 105 Ill. App. 3d 549, 555, 433 N.E.2d 1376, 1381 (1982), this court indicated that when the jury requests a transcript of evidence, the trial court must exercise its discretion in determining whether to obtain the transcript for the jury. Here, the trial judge indicated at the time of hearing on the posttrial motion that he considered the providing of a transcript was too difficult for the deliberating jury. Furthermore, the record here indicates that defense counsel agreed with the court's decision to deny a transcript. In *People v. Reid*, 136 Ill. 2d 27, 38, 554 N.E.2d 174, 179 (1990), a party acquiescing in the court's handling of

a question asked by the jury during deliberations was held to have forfeited any error in the matter. By analogy, such a forfeiture occurred here.

■ We find no error in the State's opening statement or closing argument. In opening statements, the prosecution referred to defendant's statements to emergency personnel when they first arrived. This was a proper statement of expected evidence. The prosecutor described the infant's life and Levi's fight to overcome his health difficulties. In closing arguments, the prosecution pointed out an admission made by defendant but did not improperly contend it was a confession. The prosecutor also argued that at 2 a.m. on the night in question, Levi showed no signs of dying. While Levi was impaired at that time, this prosecutor's conduct did not constitute a mischaracterization. In any event, defendant has forfeited the foregoing issues unless they constitute plain error as no defense objection was made about these issues at the trial level. *People v. Pasch*, 152 Ill. 2d 133, 168, 604 N.E.2d 294, 307 (1992).

■ The circuit court was well within its discretion in allowing the State's lead detective to sit at the prosecutor's table. Defendant admits this is the prevailing view (*People v. Jones*, 108 Ill. App. 3d 880, 886, 439 N.E.2d 1011, 1016 (1982)) but contends we should change the rule. We deem the present practice desirable in aiding the party involved to present its case and do not believe the opposing party is disadvantaged thereby.

■ We also refuse defendant's request to change the existing rule in regard to defining the phrase "reasonable doubt" to require the court to do so when, as here, requested by the jury. We recognize that doing so may not violate a defendant's right to due process. See *Victor v. Nebraska*, 511 U.S. 1, 5, 127 L. Ed. 2d 583, 590, 114 S. Ct. 1239, 1243 (1994). However, we conclude that the decision of this court in *People v. Failor*, 271 Ill. App. 3d 968, 970-71, 649 N.E.2d 1342, 1343-44 (1995), in upholding a refusal to so instruct is sound and we adhere to it.

For the reasons stated, we affirm the conviction and sentence.

Affirmed.

GARMAN, P.J., and STEIGMANN, J., concur.