21 July 2000

NO. 4-98-0934

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from

Plaintiff-Appellee, ) Circuit Court of

v. ) Sangamon County

JESSE J. TOKICH, ) No. 98CF66

Defendant-Appellant. ) 

) Honorable

) Leo J. Zappa, Jr.,

) Judge Presiding.

_______________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

A jury convicted defendant, Jesse Tokich, of first degree murder in the circuit court of Sangamon County.  The trial court sentenced him to a term of 60 years in the Illinois Depart

ment of Corrections.  He appeals his conviction, contending (1) the trial court erred by declaring one of the State's witnesses unavailable and allowing a videotaped evidence deposition of that witness under supreme Court Rule 414 (134 Ill. 2d R. 414); (2) the trial court deprived him of due process when it failed to define "reasonable doubt" upon a specific jury request to do so; and (3) the State failed to prove him guilty beyond a reasonable doubt.  We affirm.

On the morning of December 6, 1997, Katherine Hopwood was strangled to death in her home with a pair of her own slacks.  She was 83 years old.  Defendant was arrested for her murder in January 1998.  The State charged defendant with one count of intentional first degree murder, two counts of felony first degree murder, and one count each of robbery and home invasion in violation of sections 9-1(a)(1), 9-1(a)(3), 18-1(a), and 12-

11(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1), (a)(3), 18-1(a), 12-11(a)(1) (West 1996)).  After several contin

uances the trial date was set for September 21, 1998.  

Less than a week before trial, the State filed a motion for an evidence deposition.  It alleged Springfield police Detective Timothy Young, one of the lead investigators on the case, would be unavailable to give live testimony at trial.  Detective Young was scheduled to be out of the country for the adoption of a child in China.  He would be gone from September 22 to October 4 and was unable to change his plans.  The State requested it be allowed to take a videotaped evidence deposition of Detective Young pursuant to Rule 414.  

At a hearing on the merits of the motion, the defense objected, presenting several arguments.  First, if Detective Young testified on a television screen the jury would be less able to assess his credibility than if he were testifying live. Second, defendant contended Detective Young's testimony was not that crucial to the case because, although he did take more than one statement from defendant and interviewed many of the wit

nesses in the case, Detective Pat Ross was with Young for almost all of the interviews and would be able to testify to those same interviews, making Young's testimony merely cumulative.  Finally, if the State were permitted to present Detective Young's testi

mony by videotaped deposition, it would have the benefit of the testimony while defendant would not have the benefit of Young for possible impeachment purposes if the State's witnesses whom he interviewed happened to change their stories during their in-

court testimony.  Defendant did not argue Detective Young's reasons for being unavailable did not fit the requirements of Rule 414.  

The State countered by stating its willingness to stipulate to Detective Young having taken statements from any witnesses who change their stories and further stipulate that if  Young were called he would testify to what their stories origi

nally were.  The prosecutor also argued while he could call Detective Ross for many of the same purposes as Detective Young, the State's concern was if Young were not called as a witness at all, the defense would be able to argue two detectives took statements from the defendant but the jury had only heard from one.  This would permit the defense to query:  Where was the other detective and why was he not called as a witness?  The State did not want to leave itself open to such a charge.

The trial court noted its chief concern was the un

availability of Detective Young for use by defendant in impeach

ing witnesses who changed their stories.  With the State's willingness to stipulate to what Young would have testified in that regard, the court granted the State's motion.  Detective Young's testimony was videotaped and ultimately played to the jury at trial.

On appeal, defendant argues the trial court abused its discretion in granting the State's motion to take a videotaped evidence deposition of Detective Young because he was not "un

available" in the sense contemplated by Rule 414.  Defendant also contends the State could have continued the trial for the 13 days Detective Young was in China and still have begun the trial within the time allotted under the speedy trial rules.  Defendant also notes while Detective Ross testified at trial he did not testify to the interviews of defendant to which Detective Young testified and, therefore, the State set itself up for the argu

ment it wished to avoid: two detectives interviewed defendant but the jury only heard from one. 

The State contends Detective Young's absence from the country at the time of trial fit any definition of "unavailable."  He had been waiting for two years to adopt his child and would have missed the opportunity to adopt if he had not gone to China at that time.  The State maintains Rule 414 does not contemplate the testimony of a witness must be forever unavailable in order to use the provisions of the rule but only the witness be un

available on the date of trial.  

Rule 414 provides:

"(a) If it appears to the court in which a criminal charge is pending that the deposi

tion of any person other than the defendant is necessary for the preservation of relevant testimony because of the substantial possi

bility it would be unavailable at the time of hearing or trial, the court may, upon motion and notice to both parties and their counsel, order the taking of such person's deposition under oral examination or written questions for use as evidence at a hearing or trial."  134 Ill. 2d R. 414(a).

The use of videotaped depositions, as opposed to transcribed depositions, is within the discretion of the trial court but the exercise of that discretion "presupposes that the Rule 414 standards for the utilization of 
any
 deposition as evidence have been satisfied."  (Emphasis in original.) 
People v. Johnson
, 118 Ill. 2d 501, 507-08, 517 N.E.2d 1070, 1073 (1987).  The court in 
Johnson
 noted Rule 414 was intended to strike a balance between the need to preserve evidence and a criminal defendant's right to have the witnesses against him testify before the jury so demeanor and credibility could be observed and judged.  
Johnson
, 118 Ill. 2d at 508, 517 N.E.2d at 1074.  Face-

to-face live testimony should be the rule and any exceptions must be narrowly drawn and only upon a showing of special circum

stances such as the unavailability contemplated by Rule 414.  
Johnson
, 118 Ill. 2d at 508, 517 N.E.2d at 1074.  

The 
Johnson
 court found the definition of "unavailabil

ity" included in Rule 804 of the Federal Rules of Evidence (see 28 U.S.C. app. Fed. R. Evid. 804 (1994)) to be instructive.  
Johnson
, 118 Ill. 2d at 509, 517 N.E.2d at 1074.  Under Rule 804, acceptable reasons for unavailability include privilege, persis

tent contemptuous refusal to testify, failure of memory, death, or illness of the witness.  The 
Johnson
 court found the concept of "unavailability" to be a narrow one, subject to a rigorous standard.  
Johnson
, 118 Ill. 2d at 509, 517 N.E.2d at 1074.

Defendant argues the reason for Detective Young's absence, while commendable, did not measure up to the high standards contemplated by Rule 414 as noted by 
Johnson
.  This, coupled with the possibilities of either having Detective Ross testify to the same things Young would have or of continuing the trial for a mere 13 days until Young's return, did not outweigh his right to have live testimony against him.  

The State relies upon the case of 
People v. Lobdell
, 172 Ill. App. 3d 26, 525 N.E.2d 963 (1988), to support its argument Detective Young was "unavailable" within the definition of that term as contemplated by Rule 414.  In 
Lobdell
, the trial court approved the use of an evidence deposition where the complaining witness was going to be in Wisconsin during the  trial for the start of fishing season and the starting date of the trial conflicted with a previously set appointment for a furnace repair in the witness' fishing cabin there.  
Lobdell
, 172 Ill. App. 3d at 28, 525 N.E.2d at 964-65.  

Defendant rightly urges us not to accept such a broad interpretation of unavailability as the 
Lobdell
 court, but we note other cases in which unavailability was found for purposes of Rule 414 and which are not as seemingly frivolous as that in 
Lobdell
.  They include 
People v. Ramey
, 152 Ill. 2d 41, 73, 604 N.E.2d 275, 290 (1992) (where the witness cited a lack of memory even though the State argued it was feigned); 
People v. McClendon
, 197 Ill. App. 3d 472, 481, 554 N.E.2d 791, 797 (1990) (where the witness had a heart attack one week before trial); and 
People v. Rocha
, 191 Ill. App. 3d 529, 539, 547 N.E.2d 1335, 1342 (1989) (where a child witness was either unwilling or unable to testify).

Detective Young's expected absence was not merely for his own convenience, such as the witness in 
Lobdell
.  Live testimony is preferred, as noted in 
Johnson
, but the State represented that Detective Young could not alter his plans without losing the child he was to adopt.  The trial court did not abuse its discretion in allowing the videotaped deposition under these circumstances.  

Defendant next argues the trial court deprived him of his due process rights under the United States Constitution when it failed to define "reasonable doubt" upon the jury's request.  In response to the jury's request, the trial court gave this admonition: "You have received all the instructions you will receive in this case, please continue deliberations."  Defendant acknowledges this court previously declined to hold a trial court must provide a definition of reasonable doubt upon a specific jury request to do so.  
People v. Failor
, 271 Ill. App. 3d 968, 970-71, 649 N.E.2d 1342, 1343-44 (1995).  Defendant contends other states are moving toward requiring a trial court to define reasonable doubt upon a jury's request.  

Initially, the State argues defendant has forfeited this issue on appeal because he did not object to the trial court's response to the jury's request.  Generally, a defendant forfeits any error in response to a jury's questions when he fails to make a timely objection to the trial court's intended response.  
People v. Kinney
, 294 Ill. App. 3d 903, 906, 691 N.E.2d 867, 869 (1998). 
 Defendant forfeited the issue here.  According to the record, at the time the jury requested a defini

tion of reasonable doubt, not only did defendant fail to object, but he specifically agreed to the trial court's response.  When a defendant acquiesces in the trial court's answer to the jury's question, he cannot later complain the trial court abused its discretion.  
People v. Reid
, 136 Ill. 2d 27, 38, 554 N.E.2d 174, 179 (1990).  Also, defendant never submitted a definition of "reasonable doubt" he wished to be given to the jury.  When jurors raise a question during deliberations, counsel should submit, in writing, the specific response counsel wants the court to give the jury.  
Van Winkle v. Owens-Corning Fiberglas Corp.
, 291 Ill. App. 3d 165, 173, 683 N.E.2d 985, 991 (1997).  

Even if we were to review this issue on its merits under the doctrine of plain error, we would affirm.  The law in Illinois on this subject is clear.  Neither the trial court nor counsel should define reasonable doubt for the jury.  
People v. Speight
, 153 Ill. 2d 365, 374, 606 N.E.2d 1174, 1177 (1992); 
People v. Malmenato
, 14 Ill. 2d 52, 61, 150 N.E.2d 806, 811 (1958).  We have previously been asked to find an exception to this rule when a jury specifically requests a definition but we have declined to do so.  
People v. Wheeler
, 299 Ill. App. 3d 245, 255, 701 N.E.2d 178, 185 (1998), 
reversed
 
on
 
other
 
grounds
 
in
 
People v. Waters
, 188 Ill. 2d 500, 722 N.E.2d 1102 (1999); 
Failor
, 271 Ill. App. 3d at 970-71, 649 N.E.2d at 1343-44.  Again, we decline.  We conclude the trial court properly refused to define reasonable doubt upon the jury's request.

Finally, we consider defendant's contention that, because no physical evidence linked him to the crime, the State failed to prove him guilty beyond a reasonable doubt because the witnesses for the State lacked credibility and the evidence did not exclude the possibility the offense had been committed by someone other than defendant.  

When the sufficiency of the evidence to convict is challenged on appeal, the question is whether, taking all the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt.  
People v. Lewis
, 165 Ill. 2d 305, 336, 651 N.E.2d 72, 87 (1995).  This standard applies even where the evidence of guilt is circumstantial.  
People v. Holmes
, 234 Ill. App. 3d 931, 948-49, 601 N.E.2d 985, 995 (1992). 

The victim, Katherine Hopwood, lived on the first floor of  what had been her single-family home but had been converted into a duplex with a separate outside entrance leading to an upstairs apartment.  The upstairs apartment also had an entrance leading from a bedroom in the first-floor apartment.  Hopwood lived in the home with her daughter Nancy.  Nancy was out of town at the time of the murder.  Kathy Tokich, defendant's mother, an admitted crack cocaine addict and convicted thief, lived in the upstairs apartment.  Defendant previously lived with his mother in the upstairs apartment but was not living there on December 6, 1997.

On the morning of her murder, Hopwood had been to the drive-through window of three different banks and cashed three checks totaling $1,312.  The bank tellers' testimony established someone else was driving the car with Hopwood.  Other testimony established Hopwood did not usually cash checks in these amounts because the three checks exceeded the total value of all checks she had written for cash for the previous four months.  In addition, Hopwood was not in the habit of loaning large amounts of money to anyone.  

Physical evidence from the crime scene included ciga

rette butts, hair, and fibers.  Two cigarette butts were recov

ered from just outside the duplex building near the steps leading to the upstairs unit.  Ten cigarette butts were recovered from the ashtray of Hopwood's car.  All the cigarette butts and hair and fiber evidence were sent to crime labs for analysis.  Compar

ison analysis was performed on the hair and fiber evidence.  Every hair tested was dissimilar to the hair standards taken from defendant.  Hair standards were not requested of any other individual from which to make further comparisons.  

DNA analysis was performed on some of the cigarette butts.  Of the cigarette butts in Hopwood's car, only Nancy's DNA was found.  Of the cigarette butts found outside the building, one revealed the presence of DNA originating from defendant.  The other revealed DNA inconsistent with both defendant and Nancy.  DNA from this cigarette butt was not compared with the DNA of any other individuals.  The crime lab was unable to determine how long the cigarette butts had been at their point of recovery.  

Technicians also dusted the scene for fingerprints.  Of the identifiable fingerprints, none matched defendant, including those from within Hopwood's car.  The fingerprints lifted were not compared with those of anyone else.  

Kathy Tokich testified for both the State and the defense.  On the morning of December 6, she went down to Hopwood's apartment about 6 a.m. to see if Hopwood would cash a check for her so she could get some crack cocaine.  Hopwood agreed to cash the check but indicated she had no money and would have to go to the bank later to get some.  Kathy went back upstairs with a friend of hers, Bobby Dixon.  Kathy heard Hopwood leave her house about 8 a.m.  Kathy and Dixon left to cash Kathy's check at a gas station and bought crack cocaine.  They returned to her apartment around 8:45 a.m. with two men, identi

fied only as two black males, and proceeded to "get high."

Around 9 a.m. all three men left.  Kathy heard Hopwood's door slam.  Around 9:30 or 9:45 she heard the door slam again.  Kathy went downstairs and knocked on the back door but got no answer.  She saw Hopwood's car in the driveway.  She did not see defendant that morning.  

When she was called as defense witness, Kathy stated that in addition to two black men and Dixon, her friend Dale Krell was with her in her apartment on the morning of December 6.  This time she stated all four men were in her apartment when she went to see if Hopwood would cash her check.  She told the men Hopwood would have to go to the bank first.  The two black men left between 7:30 and 8, stating they would return but they never did.  Kathy testified Dixon and Krell left around 9 a.m.  

Richard Strum passed by Hopwood's house several times a day going to and from his job at a car wash near her home.  Between 10:30 and 11 on the morning of December 6, he saw an adult-sized bicycle leaning against the front steps of Hopwood's residence that was gone later that afternoon.

In the mid-afternoon of December 6, Hopwood's daughter Dorothy and Dorothy's husband discovered her body.  Hopwood's home was in disarray with papers strewn about the living and dining rooms but no sign of forced entry.  They called police and paramedics.

Dr. Travis Hindman conducted an autopsy on Hopwood's body and testified her time of death was between 9:30 a.m. and 

3 p.m.  On cross-examination, Dr. Hindman noted he calculated the time of death, based upon fluid drawn from Hopwood's eye, to be 

10 a.m.

Ann Willett testified defendant came to her house with Pat Crowder during the evening of December 5 looking for crack cocaine.  She arranged to buy $50 worth of the drug several times during that evening.  She smoked crack with defendant and Crowder until they ran out of money around midnight.  Crowder and defen

dant then left.  Defendant returned about an hour later with money he said he had borrowed from his girlfriend, Jennifer Steffen, and had Willett buy him another $40 worth of crack.  Willett and defendant got high until about 5:30 a.m. on December 6.  As defendant had run out of money, he left and Willett went to bed.  

Defendant returned to Willett's house again about 10 a.m. on December 6.  At that time, he showed approximately $1,000 in cash to Willett's two sons.  Defendant had Willett buy him two "eight balls" of crack cocaine, paying $445 for them.  Neither Willet nor Crowder had ever seen defendant with that much money before.

Jennifer Steffen, defendant's ex-girlfriend at the time of trial, testified that on December 6 defendant showed her a sum of money, including money he had set aside to pay fines he owed and a $100 bill as well as some fifties and twenties.  He claimed to have gotten it by driving someone to Chicago.  Defendant gave Steffen $50 to buy some new clothes.  Steffen denied giving defendant any money on the night of December 5 or 6 and stated defendant asked her to lie to the police and say she had given him $200.  

Cuong Luu testified he was a gang member who ran into defendant, Steffen, and another couple on the evening of December 6 in a Springfield nightclub.  Defendant told him he was "going up" because "he just killed somebody the other day" and asked Luu to hook him up in a gang for his safety.  Luu refused but did accept defendant's offer to smoke crack with him.

Defendant told Crowder on December 8 he had found two envelopes in a car each holding $500.

Detectives Young and Ross interviewed defendant about Hopwood's murder several times after they discovered, via tele

phone records, someone had called Hopwood's home shortly before 5 a.m. on December 6 from Willett's residence.  Willett told them defendant had made the call.

Defendant admitted making the telephone call but stated he was looking for Hopwood's daughter Nancy, who was his friend.  In his statements to police defendant gave varying explanations for where he got a large sum of money on December 6.  He first told them he had gotten several hundred dollars from Steffen.  Later, he told them Steffen had not given him any money, but he had been paid over $200 by his employer, the Sunrise Café.  The owner of the Café testified, however, defendant was paid only $67.37 on December 5 and $77.64 on December 12.  

Defendant initially denied being at Hopwood's house on December 6 or going to a bank with her that day.  However, later he admitted to going to a bank with her and that she had loaned him $500 to give a friend for bond money.  Defendant could not tell the detectives the name of the friend who needed the money.

In addition to the money taken from Hopwood's bank accounts, a ring was discovered missing from her home following the murder.  The ring, which had been her late husband's, was kept in a box in Hopwood's bedroom and was never taken out.  Defendant sold the ring at a pawnshop on December 15.  When he was asked about the ring, defendant twice denied having ever seen it.  However, when he was informed the pawnshop owner identified him as the seller of the ring, defendant then stated he had seen the ring lying on a kitchen counter several weeks earlier when he visited Nancy and he took the ring at that time.

Defendant argues the State failed to prove him guilty beyond a reasonable doubt.  He contends no physical evidence linked him to Hopwood's murder and the witnesses produced by the State were admitted thieves and drug dealers and users.  He did not confess to the murder, although testimony suggested the police twice had Crowder wear a concealed wire to attempt to obtain his confession.  Defendant argues the men in his mother's apartment had also been smoking crack cocaine the night and early morning before the murder and had just as much motive as he did, obtaining more money for more crack, and were in closer proximity to the scene.

Based upon the evidence, however, the jury could have reasonably found defendant was guilty of Hopwood's murder.  By his own admission, he was with Hopwood shortly before she was killed.  He did not have any money around 5:30 or 6 on the morning of December 6 but was in possession of around $1,000 by 10 a.m.  This was about the same amount of money that Hopwood received from her trips to the bank.  Defendant gave several conflicting stories regarding his possession of the money.  The jury could reasonably infer he had taken Hopwood's money and killed her to prevent her from identifying him. 

Luu testified defendant also made a statement to him, which, although not a confession, at least referred to a recent murder committed by defendant.  The jury need not speculate defendant may have been speaking of another murder he had commit

ted, nor was it required to speculate regarding the possibility the crime was committed by any of the other people in close proximity to Hopwood's house on the morning of her death.  The jury was not required to find an explanation compatible with innocence and use it to create a reasonable doubt.  
People v. Howery
, 178 Ill. 2d 1, 37, 687 N.E.2d 836, 853 (1997).

Instead, based on defendant's possession of large amounts of money following Hopwood's death, corresponding to the amounts taken from her bank accounts, his inconsistent explana

tions for his possession of this money, his admission he had recently killed someone, and his admissions he had called Hopwood's house the morning of her murder and had gone to the bank with her a short time before her death, the jury was free to conclude defendant was guilty beyond a reasonable doubt of Hopwood's murder.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

STEIGMANN and GARMAN, JJ., concur.