NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240705-U

NO. 4-24-0705

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 22, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| LIONELL L. HARRIS, | ) | No. 21CF138 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed defendant's conviction for first degree murder where the trial court did not err in (1) admitting audio recordings of defendant and his cellmate into evidence at trial, (2) permitting the video-recorded evidence deposition of an out-of-state witness to be played for the jury, (3) allowing a police officer to identify defendant in security camera video, or (4) not ruling on defendant's oral request for a private investigator or denying defendant's motion for a mistrial. However, defendant was denied effective assistance of counsel when his posttrial counsel failed to file a certification of waiver of assessments.

¶ 2     Defendant, Lionell L. Harris, was charged with first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) and aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2018)). Before trial, defendant filed several motions seeking to exclude audio recordings made through an overhear device in his prison cell. The trial court denied those motions. The case proceeded to trial on the murder charge only, and the jury found defendant guilty. The court sentenced defendant to 80 years in prison and ordered him to pay $549 in assessments. Defendant appeals, arguing that

(1) the court erred in admitting the audio recordings into evidence, (2) the court erred in permitting the evidence deposition of a witness to be admitted into evidence, (3) the court erred in allowing a police officer to identify him in security camera video, (4) the court denied him his right to present a defense by not ruling on his request for a private investigator and denying his request for a mistrial, (5) cumulative errors deprived him of a fair trial, and (6) his posttrial counsel was ineffective for failing to file a waiver of court assessments. For the reasons that follow, we affirm defendant's conviction but remand to allow defense counsel to file a certification of waiver of assessments pursuant to Illinois Supreme Court Rule 404 (eff. Sept. 1, 2023).

¶ 3                                    I. BACKGROUND

¶ 4            On November 19, 2018, Darrell Keller was found dead on Sand Street in Peoria, Illinois. On March 2, 2021, defendant was charged with one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) and one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2018)) in connection with Keller's death. The trial court initially appointed an assistant public defender to represent defendant. However, defendant eventually elected to represent himself.

¶ 5                               A. Overhear Recordings

¶ 6            In 2020, defendant was serving a sentence in an unrelated case at Illinois River Correctional Center (IRCC). On July 15, 2020, law enforcement obtained a warrant for an overhear device to be placed in defendant's cell at IRCC. The warrant permitted continuous audio recordings of conversations between defendant and his cellmate, Santana McCree, from July 21, 2020, through August 20, 2020. After expiration of the overhear, the audio recordings were provided to the trial court. On August 26, 2020, the court released the recordings to law enforcement. According to date stamps, the audio recordings began on or about July 20, 2020, and

continued until July 30, 2020, restarted on August 12, 2020, and stopped completely on August 16, 2020.

¶ 7        In April 2022, defendant filed a motion to exclude the audio recordings, asserting that they were "incomplete." On June 21, 2022, the trial court held a hearing on defendant's motion. At the hearing, McCree testified that he was defendant's cellmate at IRCC for three to four months. During that time, defendant "[told him] stories about things that had happened in Peoria," including robberies and "more violent crimes." McCree informed Officers Smith and Shaw of IRCC's intelligence unit that defendant mentioned committing "some robberies, some murder." After that, McCree talked to Peoria police officers by phone and agreed to have an overhear device placed in his cell. The device was placed inside a television. McCree understood the device was supposed to record his conversations with defendant for 30 days. McCree had no knowledge that the recording stopped for 13 days on July 30, 2020. McCree denied ever unplugging the television.

¶ 8        Seth Landwehr, the Peoria police officer who led the investigation into Keller's murder, testified that he reached out to the Illinois Department of Corrections (DOC) intelligence unit at IRCC during his investigation. Officers in the unit informed Landwehr that McCree was "a cooperator" and was sharing a cell with defendant. Landwehr sought and obtained a warrant for an overhear and obtained a television with the overhear device in it from the Chicago Police Department.

¶ 9        When the overhear expired, the television was removed from the cell, and Landwehr took it back to Chicago, Illinois, where the audio recordings were downloaded onto 10 compact discs (CDs). Landwehr took the CDs to the state's attorney, who provided them to the trial court for review. After the court's review, the recordings were returned to Landwehr.

Landwehr listened to the recordings and heard a conversation on July 28, 2020, that was relevant to Keller's murder. Landwehr testified that he did not edit any of the audio recordings and had no way of doing so because the recordings could only be accessed using proprietary software possessed only by the Chicago Police Department. Landwehr was aware of gaps in the audio recordings. It was his understanding that those gaps were the result of the television being unplugged.

¶ 10    At the conclusion of the hearing, the trial court denied defendant's motion to exclude the audio recordings. Defendant then filed a motion to continue the trial. The court granted the motion over the State's objection. Thereafter, on June 28, 2023, defendant filed a motion to suppress the audio recordings. On August 17, 2023, the court held a hearing on the motion. Landwehr provided testimony consistent with his testimony at the hearing on defendant's motion to exclude. The court denied the motion to suppress.

¶ 11    On August 24, 2023, defendant filed a motion to dismiss the charges against him, asserting that the State destroyed some of the audio recordings. On August 28, 2023, the trial court held a hearing and denied the motion. On October 3, 2023, defendant filed (1) a motion for additional discovery, asserting that the State failed to provide him with an "additional 500 hours of recorded conversation that was in fact recorded in the eavesdropping overhear" and (2) a motion for sanctions against the State for failing to provide all the recordings to him. Following a hearing, the court denied defendant's motions.

¶ 12                          B. Deposition of Elasha Rogers

¶ 13    Defendant's trial was at one point scheduled to begin on June 21, 2022. However, on that date, defendant requested a continuance. The State objected, and the trial court granted defendant's request. Immediately thereafter, the State notified the court that one of its witnesses,

- 4 -

Elasha Rogers, had traveled from Oklahoma to testify and claimed it would be "nearly impossible" for her to return on a later date. Therefore, the State asked to conduct an evidence deposition to preserve her testimony. The court granted the State's request over defendant's objection. Rogers's video-recorded evidence deposition was taken the following day in the courtroom in the presence of the court and both parties. The State questioned Rogers first, followed by cross-examination by defense counsel. Both parties made objections, which the court immediately ruled on.

¶ 14                                    C. Additional Pretrial Proceedings

¶ 15            At a scheduling conference on August 4, 2022, defense counsel informed the trial court that defendant wished to proceed *pro se*. The court responded: "Well, [defendant], that is [a] terrible idea, but it's your prerogative." Thereafter, the court admonished defendant regarding the consequences of representing himself. Specifically, the court stated: "You will not have an attorney to assist you. You will be required to comply with the rules of procedure and evidence and know the substantive law." The court further advised defendant that he "would be solely responsible for handling the entire case," without help from the court, its staff, or the court reporter. Defendant said he understood and agreed. The court concluded that defendant knowingly and voluntarily waived his right to counsel.

¶ 16            At a pretrial hearing on November 17, 2022, the trial court reappointed defendant's former counsel to represent defendant when defendant expressed that he needed help. However, on November 28, 2022, defendant again told the court that he wanted to discharge his attorney and represent himself. The court again advised defendant that it was not in his best interest to do so and encouraged him to try to work it out with his counsel. When defendant appeared in court on December 8, 2022, he again indicated that he wanted to discharge his attorney, and the court again recommended that he not do so. On March 9, 2023, the court appointed a new attorney to represent

defendant. At a hearing on March 22, 2023, defendant indicated that he wanted to discharge his new counsel. The court discouraged defendant from doing so. On May 25, 2023, defendant again indicated that he wanted to discharge his counsel, and the court admonished him again about his responsibilities if he represented himself. Defendant said he understood, and the court determined that he knowingly and voluntarily waived his right to counsel. Thereafter, defendant represented himself during the pretrial proceedings and at trial.

¶ 17 On July 27, 2023, defendant notified the trial court that he had "been informed" that Rogers was no longer living out of state but was "back up in town." Defendant asked the court if the State would still be able to use her video-recorded deposition at trial. The court responded that the State could still use Rogers's deposition at trial and instructed defendant to subpoena Rogers if he wanted to cross-examine her at trial. Defendant then said that he wanted to make sure that his witnesses were subpoenaed and asked for a private investigator to help him do so. The State objected to defendant's oral request, and the court instructed defendant to file a written motion. Defendant explained that one of the witnesses he planned to call at trial was A.G., a "little girl" who was an eyewitness.

¶ 18 At a hearing on October 5, 2023, defendant told the trial court he had subpoenas he wanted to be served on A.G. and Rogers and provided them to the deputy in the courtroom. The trial court docket shows that those subpoenas were returned unserved on October 11, 2023, and October 19, 2023. The subpoenas returned on October 11, 2023, contained the following handwritten notation: "no address for service."

¶ 19 Before defendant's jury trial began on October 24, 2023, the State moved to dismiss the aggravated battery count. Defendant did not object, and the trial court granted the motion. Trial proceeded on the sole count of first degree murder.

¶ 20                                  D. Defendant's Trial

¶ 21                                   1. *Crime Scene*

¶ 22          Christopher White of the Peoria Police Department testified that he was dispatched to Sand Street at approximately 1:10 p.m. on November 19, 2018. When he arrived, he observed an individual lying on the curb face down. White was wearing a body camera, and the video recorded by it was played for the jury. White attempted to shake the victim but got no response. The Peoria Fire Department came to the scene and attempted lifesaving measures, which were unsuccessful.

¶ 23          John Foster testified that he worked for the crime scene unit of the Peoria Police Department on November 19, 2018. He and another crime scene unit member, Paul Tuttle, were dispatched to Sand Street "to process the scene of a reported homicide." When Foster arrived, he saw "a black male victim lying on his back face up in the roadway." At the scene, Foster took photographs, which were admitted into evidence and shown to the jury. Foster located two "fired bullet[s]" on the roadway and a bullet fragment located on the chest and neck area of the victim. When Foster rolled over the victim's body, he saw "apparent gunshot wounds to his back."

¶ 24          Roberto Vasquez, a detective for the Peoria Police Department, testified that he responded to the crime scene on November 19, 2018. When he arrived, another officer advised him that there was potential video evidence captured from a residence nearby. Vasquez went to that residence and spoke to the owner, Ericka Dorsey. Dorsey told Vasquez that she had a video camera in front of her house. Dorsey had a video on her phone and played it for Vasquez. In the video, a young female in a purple coat walked northbound on Sand Street. A few seconds later, a white vehicle with front-end damage traveled southbound on Sand Street. Vasquez forwarded

video clips from Dorsey's phone to himself. Those clips were admitted into evidence and shown to the jury.

¶ 25    Seth Landwehr testified that he was a detective in the violent crimes bureau of the Peoria Police Department in November 2018 and lead detective in the investigation of Keller's murder. When Landwehr reported to Sand Street on November 19, 2018, other officers were already present and informed him that a white car may have been involved. Landwehr saw the video Vasquez obtained and saw the white car with front-end damage. Landwehr testified that officers also informed him that there was a 10-year-old witness. Landwehr said he never spoke to the witness and wanted to limit her involvement because of her age.

¶ 26    Jamie Harwood, the Peoria County coroner, testified that Dr. Fox, a forensic pathologist, performed Keller's autopsy on November 20, 2018. Dr. Fox concluded that Keller "died of multiple gunshot wounds." According to Fox, Keller had one gunshot wound to his left chest, two gunshot wounds to his right back, one "close-range" gunshot wound to his left back, a "[p]erforating" gunshot wound to his left upper arm, and an "associated penetrating gunshot re-entry wound of the abdomen."

¶ 27                    2. *Before Keller's Murder*

¶ 28    Dolandra Keller, Darrell Keller's sister, testified that she last saw her brother alive at Sydney Hobson's home in Landmark Apartments in Peoria. She said her brother's nickname was "Dre."

¶ 29    Sydney Hobson testified that she was Keller's girlfriend and lived with him in Landmark Apartments on November 19, 2018. She saw Keller that morning at approximately 10 a.m. Around that same time, Kirstain Harris, whose nickname is "Nook," came over. Sydney testified that Nook was Keller's friend and defendant's sister. Sydney testified that Keller left with

Nook between 10:30 and 11 a.m. She said Keller returned at about 12 p.m., gave Sydney money for diapers, and left again five to seven minutes later. Sydney never saw Keller after that.

¶ 30    Sydney testified that she met defendant for the first time at her apartment on November 18, 2018. She denied seeing defendant on November 19, 2018. Sydney testified that defendant's nickname was "L" and said that he was Keller's friend. Sydney was shown various video clips from November 19, 2018, taken from cameras outside Landmark Apartments. In one of the clips, Sydney identified Keller coming from the parking lot to bring her money. Other clips showed a white car in the parking lot at various times.

¶ 31    Landwehr testified that he spoke to Hobson, who told him that Keller had been at her apartment early in the day on November 19, 2018. Landwehr was able to obtain videos from Landmark Apartments for November 19, 2018. The videos were admitted into evidence and played for the jury. Landwehr testified that in the video from 10:15 a.m., Keller and Kirstain were walking next to each other. Landwehr testified that the video from 12:07 p.m. showed a white vehicle in the parking lot that he recognized as the same car he saw on the video from Sand Street. Landwehr testified that an individual who appeared to be Keller got in and out of the vehicle. Landwehr testified that at 12:10 p.m., the vehicle was moved to a different parking spot.

¶ 32    Landwehr testified that the video from 12:47 p.m. showed someone walking. Landwehr testified that he enhanced the image using Media Player so he could better see the individual and the clothing he was wearing. Landwehr testified that the individual was wearing jeans with tears and a black hoodie. Landwehr testified that the jeans the individual was wearing had tears consistent with those on jeans belonging to defendant that officers later found in a black garbage bag. Landwehr testified that he was familiar with defendant because he met him during this investigation and "[p]rior to this investigation." Specifically, Landwehr testified that he met

defendant (1) on December 15 and 16, 2018, at the Peoria police station in connection with a different incident, (2) on January 9, 2019, at the Peoria police station to obtain a DNA sample from him, and (3) in 2020 at IRCC to serve defendant with the overhear notice. Landwehr testified that, as a result, he knew what defendant looked like. When the State asked Landwehr if the individual in the video appeared to be defendant, Landwehr said, "Yes." Defendant objected, asserting that Landwehr had no basis to identify him. The trial court overruled the objection. Landwehr then testified that the final video from 12:47 p.m. showed the white vehicle leaving the parking lot and heading out of the apartment complex. Landwehr testified that he arrived at the scene on Sand Street where Keller's body was found 23 minutes later.

¶ 33                                3. *After Keller's Murder*

¶ 34        Beulah Clark testified that on November 19, 2018, she returned to her mother's house, located at 823 Spring Street, at approximately 10 p.m. and noticed that her car was gone. Beulah said she called the police and reported the vehicle stolen. Beulah described the car as "white with a big chunk out of the right fender, bumper." Beulah testified that her boyfriend owned the car, but she drove it.

¶ 35        Beulah testified that her son, Dominick Clark, whose nickname is "Domo," came home around midnight on November 19, 2018, along with defendant and his sister. Beulah was at home with Rogers at the time. Beulah testified that Dominick came inside, while defendant and his sister stayed outside. Beulah testified that Dominick appeared "distraught" and "traumatized." Beulah testified that Dominick whispered something to Rogers and then started crying. Dominick told Beulah he had "never seen someone die before" and told her what happened that day. Beulah realized her car was not stolen when Dominick told her about "the events of the day." Beulah said

defendant did not tell Dominick what he was going to do but "just did it." Beulah testified that Dominick told her "[s]tep-by-step" what happened "in this murder."

¶ 36            Beulah testified that Dominick and Rogers told her that soon after defendant arrived at the house, he took his clothes off in the driveway and put them in a garbage bag. Beulah said Dominick placed the garbage bag behind the house. Beulah testified that she took the garbage bag containing the clothes to her sister's house and stored the bag in her garage.

¶ 37            Dominick told Beulah that her car was in Chicago and that the seats had been removed. Beulah testified that she drove to Chicago with Dominick and Rogers the next day. Beulah drove to a Walgreens next to the Dan Ryan Expressway, got out of the car, and searched for bullets. Beulah did not find any bullets but found makeup that she kept in the back seat of her car on the ground. When Beulah did not find her car, she instructed Dominick to call defendant. Beulah asked defendant where her car was. Defendant said he could not tell her over the phone but could show her if she picked him up. Beulah said she did not pick up defendant because she was "scared of him." She said, "If he killed somebody, he was going to get me too."

¶ 38            Beulah testified that while she was in Chicago searching for her car, she received a message from Officer Matthew Ray of the Peoria Police Department. She called him back the following day, and Ray and another officer came to her house. The officers told Beulah they needed her car, and she told them it was in Chicago. Beulah testified that she later told Officer Matthew Ray about the bag of clothes in her sister's garage.

¶ 39            Landwehr testified that someone told him on November 20, 2018, that a white Mercury Montego was reported stolen by Beulah Clark. Landwehr talked to Beulah, who told him the car was in Chicago. On November 26, 2018. Landwehr and another officer drove to Chicago. After leaving the Walgreens off the Dan Ryan Expressway, Landwehr "happened upon" the

- 11 -

vehicle at 74th Street and Michigan Avenue. The vehicle had no license plates and was covered in several inches of snow. An officer took photographs of the vehicle, which were admitted into evidence. Landwehr confirmed through the vehicle's vehicle identification number that it was the same vehicle Beulah reported as stolen. Landwehr looked inside the vehicle and saw that the back seats were missing. Landwehr called a tow truck to transport the vehicle to a garage at the Peoria Police Department.

¶ 40        Officer Ray testified that in November 2018, Beulah Clark was one of his paid confidential informants. On November 26, 2018, Landwehr asked Ray to contact Beulah. Ray and another Peoria police officer met with Beulah in Ray's vehicle in a parking lot on Spring Street. Later, Ray and the other officer took Beulah to her sister's house, where she turned over a black plastic garbage bag full of clothing. Ray delivered the bag to Landwehr at the Peoria Police Department.

¶ 41        Officer Tuttle testified that Landwehr brought him a black garbage bag containing clothing on November 26, 2018. Landwehr asked Tuttle to photograph the clothing, which included a belt, a pair of jeans with tears, and a white T-shirt. After photographing the clothing, Tuttle delivered the bag and clothing to the Morton Forensic Science Laboratory. Jennifer MacRitchie, a DNA expert, testified that she tested stains on the white T-shirt and determined that they contained DNA belonging to defendant.

¶ 42        Officer Foster testified that he and Tuttle searched the white Mercury Montego on November 27, 2018. Foster took photographs of the vehicle, which were admitted into evidence and shown to the jury. Foster noted that the bumper was damaged. When Foster searched the vehicle, he found it had no back seats. Foster testified that he found three areas of "suspicious staining" inside the vehicle and a "red blood-like substance on the trim" of the vehicle. Foster also

found several latent fingerprints. Foster obtained swabs of the "blood-like substance" on the outside of the vehicle. Foster applied a latent blood stain reagent to the right rear passenger area of the car, and it emitted an intense blue glow, indicating the presence of blood. On November 28, 2018, Foster took the swabs and fingerprints from the vehicle to the Morton Forensic Science Laboratory.

¶ 43            John Carnes, a forensic scientist employed by the Illinois State Police, was tendered as an expert in fingerprint examination. He testified that he analyzed Keller's fingerprints and fingerprint lifts taken from the Mercury Montego. Carnes compared both sets of prints and concluded that a print from the right rear door trim of the Mercury Montego was made by Keller.

¶ 44            MacRitchie, a forensic scientist for the Illinois State Police, was tendered as an expert in DNA analysis. She testified that blood on the right rear passenger trim of the white Mercury Montego belonged to Keller.

¶ 45                                    4. *Rogers's Evidence Deposition*

¶ 46            On the first day of trial, the State moved to admit Rogers's video-recorded evidence deposition. Defendant did not object. Rogers's video-recorded deposition was admitted into evidence and played for the jury. Rogers testified that defendant and her boyfriend, Dominick, were friends. She testified that defendant went by the nickname "El." Rogers testified that she saw defendant between 12 and 1 a.m. on November 20, 2018, at a house located at 823 Spring Street. According to Rogers, defendant entered the house with Dominick, took off his clothes, and put them in a trash bag. After that, Beulah, took the trash bag and left with it.

¶ 47            Rogers testified that after taking off his clothes, defendant took a phone call, which he placed "on speaker." Rogers said that she was sitting near defendant and heard defendant say "murder." Rogers heard the person on the other end of the call say that Keller had been killed and

asked defendant where he was. Rogers said defendant responded: "[H]ell, yeah, I had to kill the n***; if I didn't kill him, he was going to kill me."

¶ 48 Rogers testified that the next day, she rode to Chicago with Dominick and Beulah. Beulah got out of her vehicle at a Walgreens in Chicago and appeared to be "[s]earching for something." Rogers testified that Beulah owned a white Buick and drove another white car that was not hers.

¶ 49                                   5. *Geofencing Evidence*

¶ 50 Landwehr testified that he could determine if a person of interest had been in or near a certain location through technology called geofencing. Using that technology, he was able to track movements of various devices and ultimately identified the identification number of a cellular device that traveled from Peoria to Chicago and back to Peoria on November 19, 2018, while stopping at relevant locations, including the Walgreens near the Dan Ryan Expressway in Chicago, the restaurant where the gun used to shoot Keller was allegedly discarded, the location of the abandoned Mercury Montego, and Beulah's mother's home. Landwehr then obtained a search warrant and requested information from Google for that device identification number. The e-mail address linked to that device was Chappo1000@gmail.com. The username for that e-mail address was "El Chappo."

¶ 51 Landwehr testified that he met with defendant at the Peoria police station on January 9, 2019, in connection with his investigation of Keller's death. After that meeting, Landwehr looked at the GPS location for the device associated with the Chappo1000 e-mail address, and it was "the Peoria Police Department."

¶ 52 Detective Clint Rezac, the sole member of the cybercrime unit of the Peoria Police Department, testified that he is familiar with geofencing data. On June 20, 2022, Landwehr asked

Rezac to run location data through ZetX software and produce a map of the route taken by the device linked to the Chappo1000 e-mail address. Rezac did this and provided an illustration to the jury. When Rezac ran the data points though the software, the mapping that came out was identical to a map Landwehr produced using data he obtained from Google Earth, Google Maps, and cell phone towers for the device associated with the Chappo1000 e-mail address.

¶ 53        Landwehr also asked Rezac to analyze e-mail data. Specifically, Landwehr asked Rezac to determine if any e-mails in the Gmail account of Chappo1000 contained defendant's name. When Rezac did that, he found 11 e-mails with the full name "Lionell Harris" in the body of them and 21 others containing the name "Lionell." Rezac admitted that the total number of e-mails in that account was in the "thousands."

¶ 54        On cross-examination, Rezac testified that there were e-mails addressed to people other than defendant but said he could not recall any of the names. Rezac admitted that at least two e-mails were addressed to "Aaron Evans." Rezac testified that he did not try to obtain further information about Aaron Evans because he was not asked to do so.

¶ 55                                6. *Audio Recordings*

¶ 56        Landwehr testified that after learning defendant was in prison, he reached out to the DOC intelligence unit in September 2019 for assistance in gathering "intel" on defendant. Landwehr contacted Lieutenant Joel Shaw of DOC, who agreed to assist Landwehr. Several months later, Shaw informed Landwehr that he placed a cooperator, McCree, in the cell with defendant. In May 2020, McCree sent DOC a letter indicating that defendant had talked about Keller's death. DOC forwarded that letter to Landwehr. Landwehr talked to McCree over the phone. Landwehr testified that he did not provide any details to McCree or Shaw about the details of his investigation because he wanted to make sure the information McCree provided was not

tainted by any information McCree received from him or Shaw. Landwehr testified that McCree relayed information to him about Keller's murder "that nobody had knowledge of except for a person that would have been there." Landwehr testified that McCree gave him names and "exact information" about the crime.

¶ 57    Shaw testified that he works for the DOC intelligence unit, which "monitors criminal activity throughout the facilities." Shaw stated that Landwehr requested an informant to be placed near defendant. Shaw chose McCree because he was on a list of informants. Shaw testified that Landwehr did not provide him with any facts about his investigation. Shaw further testified that he did not provide McCree with any information about the investigation or instruct McCree about what type of information to gather. Shaw placed McCree in defendant's cell on May 1, 2020. McCree contacted the unit by phone and by letters, which the unit forwarded to Landwehr. Landwehr asked Shaw for assistance in placing an overhear device in defendant's cell.

¶ 58    Landwehr testified that he talked to McCree on the phone about having an overhear device placed in his cell. Landwehr received trial court approval for an overhear device with a limit of 30 days, from July 21 to August 20, 2020. Landwehr obtained a television with an overhear device inside from the Chicago Police Department. The Chicago Police Department instructed him: "Plug it in and it will record. Unplug it and it will stop." The television functioned like a regular television. Landwehr testified that he had no way to access the overhear device inside the television.

¶ 59    Shaw testified that Landwehr delivered the television containing the overhear device to him, and he gave it to an intelligence officer, who gave it to the property staff at IRCC. Shaw testified that a member of the IRCC property staff then gave McCree the television, and

McCree placed it in the cell. Shaw denied being able to access the overhear device within the television.

¶ 60        Landwehr testified that he picked up the television from IRCC a few days prior to the end date of the warrant and took it back to the Chicago Police Department. Landwehr explained that only the Chicago Police Department possessed the software that allowed access to the overhear device. The recordings were downloaded to 10 CDs, which Landwehr took directly to the Peoria State's Attorney's Office.

¶ 61        Landwehr testified that he was informed on August 28, 2020, that he could review the CDs. He testified that he had no way to edit the recordings after he received them. Landwehr said McCree told him to focus on recordings from a specific day. Landwehr said he listened to the recordings from that day and heard a conversation between defendant and McCree in which defendant admitted to playing a part in Keller's death. Landwehr testified that the conversation lasted 11 to 12 minutes and was transcribed.

¶ 62        Sergeant Steven Yee of the Chicago Police Department testified that he worked in the electronic and technical support unit and provided Landwehr with the television with the recording device. Yee testified that the television had a recorder inside that began recording when the television was plugged in. Yee testified that the recording device inside the television was powered from the television plug. When the television was plugged in, the device activated. When the television was unplugged, the device deactivated.

¶ 63        Yee testified that the recordings were extracted by removing part of the television set and plugging a "proprietary cable" into the overhear device and connecting it to a computer. He said the only way to obtain the recorded information was through the "proprietary cable." Yee testified that no one in the Chicago Police Department could edit the recordings. Yee explained

that the files contained dates and times that were added automatically by the proprietary software. Yee testified that there would be gaps in the recordings if the device was unplugged. After the recordings were downloaded to the computer, Yee placed them on discs and gave the discs to Landwehr. All the discs were admitted into evidence at trial, but only the July 28, 2020, conversation between defendant and McCree was played for the jury, and only that conversation was provided to the jury during deliberations.

¶ 64                                  7. *McCree's Testimony*

¶ 65            McCree testified that he was an inmate in DOC serving a 40-year sentence for murder and 5-year sentence for concealment. He testified that he was placed in a cell with defendant at IRCC on May 1, 2020, as "an informant." McCree testified that before being placed with defendant, "I was just told they was lookin' at this guy and that was pretty much the end of that conversation." McCree denied being told any information about defendant or why he was being investigated. McCree said he was never told "what they was actually lookin' for."

¶ 66            McCree testified that within a few weeks of May 1, 2020, defendant initiated a conversation with him about the death of someone named "Dre." Defendant told him that he, Domo, Nook, and Dre were in a car together when Dre received a phone call. Defendant told Dre he wanted to know whom he was talking to. After that, defendant told Domo, who was driving, to pull over so they could change seats. After Domo pulled over, Nook, who was sitting in the back seat with Dre, switched to the driver's seat, and Domo sat in the back seat with Dre. When Dre got off the phone, defendant activated all the door locks so Dre could not get out of the car. Defendant then turned around and shot Dre in the chest. Dre said, "[Y]our brother?" Defendant responded, "[Y]ou ain't my brother," and shot Dre again. Dre tried to reach across to open the door next to Domo, and defendant "turned all the way around and put the gun on him and just boom, boom,

- 18 -

boom." Defendant said Dre "started hollerin' 'ah, ah, ah.' " Defendant said Dre ended up "bein' slumped meanin' not movin'." Defendant told Domo to get out of the car, and defendant shot Dre again. McCree testified that defendant told him the car Domo was driving belonged to Domo's grandmother or mother. McCree said defendant told him they took the car to Chicago, took the back seats out of it, and abandoned it. McCree admitted that he did not remember Dre's full name. McCree testified that defendant told him he shot Dre in the chest, back, and head or face area. McCree testified that defendant told him that he and Domo had previously robbed someone named Big Lou and that Big Lou was looking for defendant, which made defendant worried that Dre was talking on the phone to someone about that.

¶ 67        McCree testified that he reached out to the DOC intelligence unit and relayed what defendant told him in a letter. McCree said he was aware that an overhear was going to be placed in a television that DOC gave him. McCree denied receiving any instructions about the television. McCree brought the television to the cell and plugged it in. After the television was in the cell, defendant talked to McCree again about killing Dre.

¶ 68        The State moved to admit the audio recording of that conversation and the transcription. Defendant objected, arguing that (1) the audio recording was not relevant and that a proper foundation had not been laid for its admission and (2) the transcript of the recording was unnecessary. The trial court overruled defendant's objections.

¶ 69        The State played the audio recording and gave the jurors copies of the transcript. During that conversation, defendant told McCree that he shot "Deuce" multiple times while he was in a car with him, Nook, and "Damu." Defendant said that after he shot and killed Deuce, "Damu" dragged Deuce out of the car. Defendant provided details about the event, including that (1) "Damu" and Nook switched seats, (2) Deuce tried to "jump over Damu's ass" to get out of the

car but couldn't because defendant was holding the door lock button, (3) "Damu said 'man one of them [bullets] almost hit me bro,' " (4) defendant shot Deuce in the back outside the car "to make sure" he was dead, (5) Deuce looked "surprised" when defendant shot him, and (6) "Nook looked shocked" when she heard the shots. Defendant also discussed how loud the gunshots were inside the vehicle with "[a]ll the doors closed." McCree testified that Deuce and Dre were the same person and that Damu's full name was "Dominic."

¶ 70        McCree was removed from defendant's cell on August 19, 2020. McCree testified that defendant never took back what he said about Dre's death or claimed he was just joking. McCree denied being promised any deal or incentive for testifying against defendant. McCree admitted that he cooperated in another case and his sentence was reduced by seven years because of his cooperation. McCree testified that he came forward with the information defendant told him because it was "disturbin' " and "sickenin'."

¶ 71        On cross-examination, McCree admitted that he was in prison for stabbing a woman to death and trying to hide her body. McCree denied that anyone ever asked him to gather specific information about defendant. He testified: "They just said they was lookin' at this guy and that was the end of that. Nobody never indicated what they was lookin' for or none of that." McCree said that when defendant "started talkin' I just started writin' it down." McCree admitted that he "probably" told defendant stories that were untrue while he was defendant's cellmate.

¶ 72                8. *Defendant's Anticipated Witnesses*

¶ 73        On the first day of trial, defendant said he would be calling two witnesses to testify: A.G. and Elasha Rogers. On the third day of trial, defendant discovered that A.G. and Rogers were not served with subpoenas. The following day, neither A.G. nor Rogers came to court to testify.

On the fourth day of trial, defendant made an oral motion for a mistrial, which the trial court denied. Defendant did not present any evidence at trial.

¶ 74                                    9. *Verdict and Posttrial Proceedings*

¶ 75        The jury found defendant guilty of murder. Defendant filed a motion for a new trial, arguing that the trial court erred in (1) allowing the State to admit geofencing evidence, (2) allowing Landwehr to identify defendant in the video from Landmark Apartments, (3) allowing Rogers's evidence deposition to be admitted at trial, (4) allowing McCree's testimony, the audio recording evidence, and its transcription to be admitted, (5) denying his motion to suppress evidence obtained from a search warrant, and (6) denying his motion for discharge due to a speedy-trial violation. The court denied the motion and sentenced defendant to 80 years in prison. The court also ordered defendant to pay $549 in criminal assessments.

¶ 76        Thereafter, defendant requested counsel to assist him in posttrial proceedings, and the trial court appointed an attorney from the Peoria County Public Defender's Office to represent defendant. Defense counsel filed a motion to reconsider defendant's sentence, which the court denied.

¶ 77        This appeal followed.

¶ 78                                    II. ANALYSIS

¶ 79                                    A. Plain Error

¶ 80        Defendant has forfeited many of the issues he raises on appeal and must seek review of those issues pursuant to the plain-error doctrine. Accordingly, we will begin with an overview of plain error.

¶ 81        "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214

Ill. 2d 455, 470 (2005). If a defendant fails to do either, his challenge is considered forfeited on appeal. *Woods*, 214 Ill. 2d at 470. "The plain error rule is a well-established exception to forfeiture principles, allowing reviewing courts discretion to excuse a defendant's procedural default." *People v. Moon*, 2022 IL 125959, ¶ 19. The plain error rule allows reviewing courts to review a forfeited error if it falls under one of two alternative prongs:

"(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Moon*, 2022 IL 125959, ¶ 20.

"Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 82        The first step in the plain-error analysis is to determine whether a clear or obvious error occurred. *Moon*, 2022 IL 125959, ¶ 22. If a clear or obvious error occurred, the next step turns on which prong of plain error the defendant has invoked to seek review of the forfeited error. *Moon*, 2022 IL 125959, ¶ 23. However, if there is no clear or obvious error, the defendant has not met his burden and "the procedural default will be honored." *Hillier*, 237 Ill. 2d at 549.

¶ 83                                 B. Overhear Recordings

¶ 84        Defendant's first argument on appeal is that the trial court erred in allowing the overhear recordings to be admitted into evidence because gaps existed in the recordings. While defendant objected at trial to admission of the recordings, he did not raise this precise issue in his posttrial motion. Therefore, he forfeited review of this alleged error unless he can establish plain

error. Thus, we must first determine if a clear or obvious error occurred. See *Moon*, 2022 IL 125959, ¶ 22.

¶ 85　　　　"A partially inaudible sound recording is admissible unless the inaudible portions are so substantial as to render the recording untrustworthy as a whole." *People v. Manning*, 182 Ill. 2d 193, 212 (1998). Inaudible portions of recordings alone do not undercut a recording's overall reliability or trustworthiness. *People v. Perkins*, 2024 IL App (2d) 230214, ¶ 39. "[I]t is not the number of inaudible portions that adversely affects trustworthiness; instead, it is the reason for the inaudible portions." *Perkins*, 2024 IL App (2d) 230214, ¶ 41. A recording should be considered trustworthy where there is no indication it has been tampered with. See *Perkins*, 2024 IL App (2d) 230214, ¶ 42; *People v. Bauer*, 393 Ill. App. 3d 414, 422 (2009).

¶ 86　　　　Where inaudible portions of a recording do not interfere with understanding the audible portions of a defendant's statement, the recording should be admitted. *Bauer*, 393 Ill. App. 3d at 422; see *Perkins*, 2024 IL App (2d) 230214, ¶ 44. This is because inaudible gaps in a recording are relevant only to the weight of the evidence, not its admissibility. *Manning*, 182 Ill. 2d at 212. A defendant is not harmed when an incomplete audio recording is admitted into evidence because the defendant can cross-examine the individual who made the recording and is free to argue the meaning and reliability of any admitted portions of the recordings to the jury. See *Perkins*, 2024 IL App (2d) 230214, ¶ 44.

¶ 87　　　　The admission of an incomplete recording is a matter within the trial court's discretion. *Manning*, 182 Ill. 2d at 212. A court abuses its discretion if it refuses to allow a reliable and trustworthy recording into evidence. See *Perkins*, 2024 IL App (2d) 230214, ¶ 39.

¶ 88　　　　Here, the evidence established that while an overhear was approved to record defendant and McCree in their cell at IRCC from July 21, 2020, to August 20, 2020, the overhear

device recorded on or about July 21, 2020, to July 30, 2020, and again from August 12 to 16, 2020, but did not record from July 31 to August 11, 2020, or August 17 to 20, 2022. Ten CDs from the days the overhear device recorded were admitted into evidence at defendant's trial. A conversation between defendant and McCree that occurred on July 28, 2020, was played for the jury.

¶ 89 While the recordings in this case did not contain inaudible gaps, they contained gaps of several days when no recordings were made at all. Nevertheless, the cases above are instructive because they establish that (1) gaps in and of themselves do not render recordings untrustworthy or unreliable, (2) recordings containing gaps should be admitted into evidence unless the gaps make the audible portions of the recordings unclear or confusing, and (3) recordings, even incomplete ones, should be deemed trustworthy unless there is evidence of tampering. See *Manning*, 182 Ill. 2d at 212; *Perkins*, 2024 IL App (2d) 230214, ¶¶ 39, 42, 44; *Bauer*, 393 Ill. App. 3d at 422. Applying these principles to the recordings at issue, the trial court did not abuse its discretion in allowing the recordings into evidence because the portions admitted were clear and understandable and there was no evidence that anyone tampered with the device or recordings. According to the undisputed testimony of Landwehr and Yee, the only way to access the overhear device inside the television was through a proprietary cable and software owned only by the Chicago Police Department. Thus, no one could have tampered with the overhear device to delete the recordings for several days. In the absence of evidence or testimony that McCree or someone else somehow tampered with the overhear device or recordings in some way, the court properly ruled that the recordings were trustworthy and, thus, admissible. See *Manning*, 182 Ill. 2d at 212; *Perkins*, 2024 IL App (2d) 230214, ¶ 44; *Bauer*, 393 Ill. App. 3d at 422.

¶ 90 Furthermore, defendant had the opportunity to cross-examine several witnesses involved in obtaining the overhear device and the recordings from the device, including McCree,

Landwehr, Yee, and Shaw. Additionally, defendant was free to and did argue to the jury that the recordings were unreliable because recordings were not made on some days covered by the overhear warrant. Thus, defendant was not harmed by admission of the incomplete recordings. See *Perkins*, 2024 IL App (2d) 230214, ¶ 44.

¶ 91            For all these reasons, the trial court did not commit a clear or obvious error in allowing the recordings to be admitted into evidence. Moreover, because the court's admission of the recordings did not amount to a clear or obvious error, defendant cannot establish plain error. See *Hillier*, 237 Ill. 2d at 549.

¶ 92                                C. Rogers's Evidence Deposition

¶ 93            Defendant next argues that the trial court erred in admitting the evidence deposition of Rogers at trial pursuant to Illinois Supreme Court Rule 414(a) (eff. Oct. 1, 1971) and Illinois Rule of Evidence 804(a) (eff. Jan. 1, 2011), because the State failed to establish that Rogers was unavailable at the time of trial. However, defendant failed to object when the State moved for admission of the deposition at trial and did not raise this argument in his posttrial motion.

¶ 94                                1. *Waiver Versus Forfeiture*

¶ 95            We must consider an issue the State raises on appeal—that defendant waived, rather than forfeited, this issue, thereby foreclosing plain-error review. "[T]he terms forfeiture and waiver have been used at times interchangeably, and often incorrectly, in criminal cases." *People v. Brown*, 2020 IL 125203, ¶ 25. However, they are distinct concepts. "Waiver is an intentional relinquishment or abandonment of a known right or privilege, while forfeiture is the failure to make the timely assertion of a right." *Brown*, 2020 IL 125203, ¶ 25. While forfeiture occurs accidentally or negligently, waiver is an intentional decision to abandon a known legal argument. *People v. Scott*, 2015 IL App (4th) 130222, ¶ 24. When a defendant affirmatively acquiesces to

actions taken by the trial court, waiver has occurred. *Scott*, 2015 IL App (4th) 130222, ¶ 24. Plain-error review is available for forfeited, but not waived, issues. *Scott*, 2015 IL App (4th) 130222, ¶ 21.

¶ 96       Based on the record before us, we do not believe defendant intentionally abandoned his right to challenge admission of Rogers's video-recorded evidence deposition. Defendant objected to the taking of Rogers's evidence deposition in June 2022. Additionally, in July 2023, defendant raised the issue again, arguing that he should be able to cross-examine Rogers at trial in front of the jury since Rogers had allegedly returned to the area and no longer lived out of state. While preserving the issue for review would have required more, construing waiver principles liberally in favor of defendant as we must (*Scott*, 2015 IL App (4th) 130222, ¶ 25), we find that defendant's failure to raise a contemporaneous objection to admission of the deposition at trial was not an intentional relinquishment of his right to challenge admission of the deposition. Rather, defendant's failure to object at trial and raise the issue in his posttrial motion amounted to a forfeiture, and we may review defendant's claim for plain error.

¶ 97              2. *Supreme Court Rule 414 and Rule of Evidence 804*

¶ 98       "Testimony taken outside the presence of the jury for later admission at trial, even if taken in a courtroom with a judge presiding, is an evidence deposition that must comply with Supreme Court Rule 414." *People v. Spain*, 285 Ill. App. 3d 228, 240 (1996) (citing *People v. Johnson*, 118 Ill. 2d 501 (1987)). Rule 414(a) provides, in pertinent part

> "If it appears to the court in which a criminal charge is pending that the deposition
> of any person other than the defendant is necessary for the preservation of relevant
> testimony because of the substantial possibility it would be unavailable at the time
> of hearing or trial, the court may *** order the taking of such person's deposition

under oral examination *** for use as evidence at a hearing or trial." Ill. S. Ct. R. 414(a) (eff. Oct. 1, 1971).

¶ 99 Rule 414 contemplates the use of a deposition as evidence at trial where the witness is "unavailable." *People v. Lewis*, 2021 IL App (3d) 180259, ¶ 23. "In turn, Illinois Rule of Evidence 804(a) (eff. Jan. 1, 2011) defines the unavailability of a witness." *Lewis*, 2021 IL App (3d) 180259, ¶ 23. " 'Unavailability as a witness' includes situations in which the declarant *** is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance *** by process or other reasonable means." Ill. R. Evid. 804(a)(5) (eff. Jan. 1, 2011).

¶ 100 The proponent of the evidence has the burden of proving the unavailability of the witness. *People v. Kent*, 2020 IL App (2d) 180887, ¶ 94. To sustain its burden, the proponent must show that it has made a "good-faith effort to obtain the witness's presence at trial." (Internal quotation marks omitted.) *Kent*, 2020 IL App (2d) 180887, ¶ 97. A trial court's determination that a witness is unavailable is reviewed for an abuse of discretion. *Lewis*, 2021 IL App (3d) 180259, ¶ 23. "The court abuses its discretion where its decision is arbitrary, fanciful, or so unreasonable that no reasonable person would take the same position." *Lewis*, 2021 IL App (3d) 180259, ¶ 23. Where the State shows that a witness has plans to be out of the state at the time of the defendant's trial, the court's decision to admit the evidence deposition of that witness is not an abuse of discretion. See *People v. Tokich*, 314 Ill. App. 3d 1070, 1073-74 (2000); *People v. Lobdell*, 172 Ill. App. 3d 26, 28-29 (1988).

¶ 101 Here, defendant has not met his burden under the plain-error doctrine to establish that the trial court committed a clear or obvious error by abusing its discretion in allowing the evidence deposition of Rogers to be admitted into evidence. The court reasonably granted the State's request to take Rogers's deposition because Rogers was living out of state and unable to

return to Illinois for trial. Rogers's presence out of state was a sufficient basis for the court to admit Rogers's evidence deposition at defendant's trial. See *Tokich*, 314 Ill. App. 3d at 1073-74; *Lobdell*, 172 Ill. App. 3d at 28-29. Thus, the requirements of Supreme Court Rule 414 and Rule of Evidence 804 were satisfied.

¶ 102     Defendant contends for the first time on appeal that the State failed to show that Rogers remained out of state and "unavailable" at the time of defendant's trial. However, defendant did not object to admission of the deposition on this or any other basis at trial. "[I]t is well-established that a trial court is not required to exclude improper evidence when the defendant does not object or move to exclude it." *People v. Marchese*, 32 Ill. App. 3d 872, 878 (1975). When a defendant does not raise a proper and timely objection to evidence but argues for the first time on appeal that the State failed to lay a proper foundation for its admission at trial, the defendant deprives the State of the opportunity to correct any deficiency at the trial level. *Woods*, 214 Ill. 2d at 470.

¶ 103     Absent an objection by defendant to the admission of Rogers's deposition at trial, the trial court had no responsibility to consider whether the State met the foundational requirements for admission of the evidence deposition, and the State had no opportunity to correct any foundational deficiencies that may have existed. As such, the court did not commit a clear or obvious error in admitting the deposition at trial. In the absence of a clear or obvious error, defendant cannot establish plain error. See *Hillier*, 237 Ill. 2d at 549.

¶ 104                    D. Landwehr's Identification Testimony

¶ 105     Defendant next argues that the trial court erred in allowing Landwehr to identify defendant in the surveillance video from Landmark Apartments because Landwehr's testimony (1) violated Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) and (2) was more prejudicial than

probative. At trial, defendant objected to Landwehr's testimony, asserting that Landwehr lacked a sufficient basis to identify him. Defendant raised the same issue in his posttrial motion, specifically asserting that Landwehr's testimony violated Rule of Evidence 701. Therefore, defendant preserved the issue of the admissibility of Landwehr's testimony pursuant to Rule of Evidence 701. However, defendant argues for the first time on appeal that Landwehr's testimony was more prejudicial than probative. Thus, defendant forfeited that issue, and we can review it only for plain error. See *Moon*, 2022 IL 125959, ¶ 19.

¶ 106                                    1. *Rule of Evidence 701*

¶ 107        Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) addresses the admissibility of lay opinion identification testimony and provides that such testimony is admissible if it is (1) "rationally based on the perception of the witness" and (2) "helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue." *People v. Thompson*, 2016 IL 118667, ¶ 50. "Lay opinion identification testimony is helpful where there is some basis for concluding the witness is more likely to correctly identify the defendant from the surveillance recording than the jury." *Thompson*, 2016 IL 118667, ¶ 50. "A showing of sustained contact, intimate familiarity, or special knowledge of the defendant is not required." *Thompson*, 2016 IL 118667, ¶ 50. Rather, the witness must only have had more contact with the defendant than the jury "to achieve a level of familiarity that renders the opinion helpful." *Thompson*, 2016 IL 118667, ¶ 50.

¶ 108        Whether lay opinion identification testimony is helpful is based on a totality of the circumstances. *Thompson*, 2016 IL 118667, ¶ 51. The following factors should be considered in determining whether there is some basis for concluding that a witness is more likely than the jury to correctly identify the defendant: (1) "the witness's general familiarity with the defendant,"

(2) "the witnesses' familiarity with the defendant at the time the recording was made or where the witness observed the defendant dressed in a manner similar to the individual depicted in the recording," (3) "whether the defendant was disguised in the recording," (4) whether the defendant "changed his/her appearance between the time of the recording and trial," and (5) "the clarity of the recording and extent to which the individual is depicted." *Thompson*, 2016 IL 118667, ¶ 51.

¶ 109 "[T]he absence of any particular factor does not render the testimony inadmissible." *Thompson*, 2016 IL 118667, ¶ 51. Rather, the existence of just one factor can provide a basis for a trial court's conclusion that the witness is more likely than the jury to correctly identify the defendant. *Thompson*, 2016 IL 118667, ¶ 49. Even a short interaction with defendant can give a witness "a perspective the jury would not acquire in its limited exposure to defendant in the courtroom" and will provide some basis to conclude that the witness is more likely to correctly identify defendant than the jury. *Thompson*, 2016 IL 118667, ¶ 62. A reviewing court will not reverse a court's decision to admit lay opinion identification testimony unless the decision constitutes an abuse of discretion. *Thompson*, 2016 IL 118667, ¶ 53.

¶ 110 Here, the trial court did not abuse its discretion in allowing Landwehr to identify defendant in the video from Landmark Apartments. At trial, Landwehr testified that he was familiar with defendant because he met him on several occasions prior to trial: twice in 2019 and once in 2020. Thus, Landwehr's testimony satisfied the first factor, "the witness's general familiarity with the defendant." *Thompson*, 2016 IL 118667, ¶ 51. This factor alone was sufficient to support admission of Landwehr's testimony. See *People v. Longs*, 2024 IL App (4th) 230501, ¶ 43. However, several other factors were also satisfied.

¶ 111 Landwehr testified that he was familiar with the clothing defendant wore on the day the video was recorded because he was provided with the black garbage bag containing defendant's

clothing, which included the jeans defendant wore in the video. Because Landwehr was familiar with the clothing defendant was wearing in the surveillance video, the second factor also supported admission of Landwehr's testimony. See *Thompson*, 2016 IL 118667, ¶ 51. Furthermore, in the video, defendant wore a hooded sweatshirt with the hood up, covering defendant's hair and obscuring his face. Because defendant's face and hair were not clearly visible in the video, the third factor supported the admission of Landwehr's testimony. See *United States v. Ellis*, 121 F. 3d 908, 926-27 (4th Cir. 1997) (upholding lay opinion identification of defendant who was wearing a mask and hooded sweatshirt). Finally, the original recording depicted defendant at quite a distance, but Landwehr was able to enhance the image using Media Player to zoom in on defendant's face. Thus, the fifth and final factor supported the trial court's admission of Landwehr's testimony. See *People v. Mister*, 2016 IL App (4th) 130180-B, ¶¶ 76-77 (affirming admission of an officer's identification testimony where original video lacked clarity but the officer produced short clips and isolated frames to create still images for the jury). Because nearly all the relevant factors supported the court's finding that Landwehr's testimony was helpful to the jury, the court did not abuse its discretion in allowing Landwehr's testimony identifying defendant. See *Thompson*, 2016 IL 118667, ¶ 49; *Longs*, 2024 IL App (4th) 230501, ¶ 43.

¶ 112                     2. *Prejudicial Versus Probative Value*

¶ 113          An objection to the admission of evidence at trial forfeits all grounds not specified. *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). Where the issue the defendant raises on appeal is significantly different from the issue raised below, it is forfeited. *Lovejoy*, 235 Ill. 2d at 148. A forfeited issue can only be reviewed for plain error. *Moon*, 2022 IL 125959, ¶ 19.

¶ 114          Here, defendant objected at trial to admission of Landwehr's testimony, asserting that Landwehr lacked a sufficient basis to identify him. Defendant never objected on the basis that

Landwehr's testimony was more prejudicial than probative. Thus, defendant forfeited that issue, and we can review it only for plain error.

¶ 115    Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) provides, in pertinent part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Defendant argues that Landwehr's testimony was more prejudicial than probative because jurors likely inappropriately gave his testimony as a law enforcement officer more weight than the testimony of other witnesses. Defendant further contends that Landwehr's testimony usurped the role of the jury.

¶ 116    Our supreme court has specifically rejected a prohibition against police officers providing identification testimony, stating: "There is no *per se* rule against admission of a law enforcement officer's identification testimony." *Thompson*, 2016 IL 118667, ¶ 56. Our supreme court has also rejected the contention that layperson identification testimony usurps the role of the jury, explaining that such testimony does "not invade the province of the jury because the jury is free to reject or disregard such testimony and reach its own conclusion regarding who is depicted in the surveillance recording." *Thompson*, 2016 IL 118667, ¶ 54.

¶ 117    Furthermore, in this case, the trial court instructed the jury as follows:

"You have before you evidence that a law enforcement officer made an identification of the defendant from a video recording. It is for you to determine what weight, if any, should be given to that evidence. In determining the weight to be given to this evidence, you should not draw any inference from the fact that the witness is a law enforcement officer." Illinois Pattern Jury Instructions, Criminal, No. 3.15B (approved Jan. 26, 2018).

Because the court told jurors that they could decide what weight, if any, to give to Landwehr's testimony, Landwehr's identification testimony did not usurp the role of the jury. See *People v. Brownlee*, 2024 IL App (4th) 231139-U, ¶ 68 (finding that the above limiting instruction ensured that an officer's identification testimony "would not invade the province of the jury").

¶ 118                                    E. Defendant's Right to Present a Defense

¶ 119          Defendant contends that the trial court denied him his right to present a defense when it (1) failed to rule on his oral request for a private investigator and (2) denied his request for a mistrial. Defendant failed to include either of these issues in his motion for a new trial. Defendant concedes that he forfeited these issues but contends that they amount to plain error because the evidence was closely balanced.

¶ 120                                    1. *Request for a Private Investigator*

¶ 121          "[A] party filing a motion is responsible for obtaining a ruling from the trial court on the motion." *People v. Brusaw*, 2023 IL 128474, ¶ 17. "A movant's failure to obtain a ruling on a motion does not translate into a denial of the motion by the court." (Internal quotation marks omitted.) *Brusaw*, 2023 IL 128474, ¶ 17. Rather, if no ruling is obtained, the movant is presumed to have abandoned the motion. *Brusaw*, 2023 IL 128474, ¶ 17. Because a motion not ruled upon is deemed abandoned, the movant cannot request review of the motion on appeal. *Brusaw*, 2023 IL 128474, ¶ 17; see *People v. Neal*, 142 Ill. 2d 140, 151 (1990) ("[A] movant has the responsibility to obtain a ruling on his motion if he wishes to raise a question pertaining thereto on appeal."). This rule of abandonment "serves an important function by ensuring that a movant, who is fully aware of the motion that was filed, cannot remain silent in the trial court and then, on appeal, 'take advantage of his failure to have [the] motion passed upon.' " *Brusaw*, 2023 IL 128474, ¶ 17 (quoting *People v. Hornaday*, 400 Ill. 361, 365 (1948)).

¶ 122          In this case, defendant orally requested a private investigator on July 27, 2023. The State objected, and the trial court instructed defendant to file a written motion setting forth his request. Defendant never filed a written motion and never mentioned his request for a private investigator again in court. Thus, defendant never obtained a substantive ruling on his oral request, and we must presume that defendant abandoned his request for a private investigator. See *Brusaw*, 2023 IL 128474, ¶ 18. Further, nothing in the record negates this presumption. Defendant appeared before the court several more times prior to trial and said nothing about a private investigator. By his actions, defendant abandoned his request for a private investigator. See *Brusaw*, 2023 IL 128474, ¶ 19. As a result, defendant is foreclosed from raising any challenge regarding his request for a private investigator on appeal. See *Brusaw*, 2023 IL 128474, ¶ 19; *Neal*, 142 Ill. 2d at 151-52.

¶ 123                              2. *Request for a Mistrial*

¶ 124          "Generally, a mistrial should be granted where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceedings would defeat the ends of justice." *People v. Bedoya*, 2021 IL App (2d) 191127, ¶ 108 (citing *People v. Sims*, 167 Ill. 2d 483, 505 (1995)). The party moving for a mistrial bears the burden of establishing that a declaration of a mistrial is "manifestly necessary or consistent with the ends of justice." *People v. Campbell*, 126 Ill. App. 3d 1028, 1036 (1984). A trial court's denial of a request for a mistrial will not be disturbed on appeal unless the court abused its discretion. *Sims*, 167 Ill. 2d at 505; *Bedoya*, 2021 IL App (2d) 191127, ¶ 108.

¶ 125          Here, the trial court did not abuse its discretion in denying defendant's request for a mistrial because no grave error infecting the fundamental fairness of the trial occurred. See *Bedoya*, 2021 IL App (2d) 191127, ¶ 108. Rather, defendant requested a mistrial because of his

own failure to secure the attendance of his witnesses. The record reflects that on October 11, 2023, almost two weeks before defendant's trial began, the subpoenas for A.G. and Rogers were returned unserved because "no address for service" was provided for them. Additional subpoenas for those same witnesses show that they were returned unserved on October 19, 2023, four days before defendant's trial. Nevertheless, defendant proceeded to trial and failed to check on the status of his subpoenas until several days after the trial started. At that time, the court advised defendant that the subpoenas had not been served. Defendant contends that he was not able to follow up on the subpoenas for his witnesses because he was in jail and proceeding as a *pro se* litigant.

¶ 126        We reject defendant's contention that his status as a *pro se* litigant required the trial court to grant his request for a mistrial. "[P]*ro se* litigants are not entitled to special treatment in the courtroom and the normal rules of procedure apply without dispensation." *People v. Hudson*, 86 Ill. App. 3d 335, 340 (1980). A defendant who chooses to represent himself is responsible for his decision and its consequences. *Hudson*, 86 Ill. App. 3d at 340. A *pro se* defendant "is responsible for his representation and is held to the same standards as any attorney." *People v. Richardson*, 2011 IL App (4th) 100358, ¶ 12. "Courts are not required to relax the rules of criminal procedure [citation] or to assume a partisan or protective role toward the defendant." *Hudson*, 86 Ill. App. 3d at 340. "A *pro se* defendant's inability to represent himself competently does not invest the trial court with a duty to intervene and assist in the defense." *Hudson*, 86 Ill. App. 3d at 340. Furthermore, a defendant may not "complain of errors that he injected into his own trial." *People v. Allen*, 401 Ill. App. 3d 840, 854 (2010).

¶ 127        Here, the trial court warned defendant many times about the difficulties he would face representing himself and repeatedly encouraged defendant not to discharge his counsel. Nevertheless, defendant chose to represent himself. As such, defendant was solely responsible for

the preparation and presentation of his defense, which included ensuring that the witnesses he intended to call at trial were properly subpoenaed. See *Allen*, 401 Ill. App. 3d at 854. Defendant failed to do so; therefore, the basis of his motion for a mistrial was "entirely of his own making." *Allen*, 401 Ill. App. 3d at 854. Thus, the court did not abuse its discretion in denying defendant's motion for a mistrial.

¶ 128    Nevertheless, defendant argues that the trial court's ruling on his request for a mistrial was an abuse of discretion based on the factors a court must consider in ruling on a motion for a continuance. However, defendant never sought a continuance to secure the presence of his witnesses. The only relief defendant requested was a mistrial. A party cannot reasonably complain about not receiving a continuance if he never requested one. *People v. Smith*, 2012 IL App (4th) 100901, ¶ 138. Because defendant never requested a continuance, we need not consider whether it would have been proper for the court to grant one. See *Smith*, 2012 IL App (4th) 100901, ¶ 139.

¶ 129                                F. Cumulative Errors

¶ 130    Defendant next contends that if the individual errors he raised on appeal were insufficient to support reversal, the cumulative effect of the errors was.

¶ 131    The cumulative-error doctrine provides that "individual trial errors that do not entitle a defendant to appellate relief may do so if the errors, when considered in the aggregate, have the cumulative effect of denying [the] defendant a fair trial." (Internal quotation marks omitted.) *People v. Quezada*, 2024 IL 128805, ¶ 46. Cumulative error arises only from actual trial errors. *Quezada*, 2024 IL 128805, ¶ 46. Where none of the issues raised by the defendant constitute error, "logic dictates that there cannot be cumulative error." *People v. Franklin*, 135 Ill. 2d 78, 105 (1990).

¶ 132         In this case, as discussed herein, none of the individual errors defendant raised on appeal constituted errors. Therefore, defendant's cumulative error claim fails. See *Quezada*, 2024 IL 128805, ¶ 46; *Franklin*, 135 Ill. 2d at 105.

¶ 133                    G. Ineffective Assistance of Posttrial Counsel

¶ 134         Finally, defendant asserts that his posttrial counsel was ineffective for failing to file a certification for waiver of court assessments. The State concedes that defense counsel was ineffective for failing to do so and that the case should be remanded to the trial court to allow defense counsel to file the certificate.

¶ 135         To establish a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Tate*, 2012 IL 112214, ¶ 18. The defendant must show that (1) his counsel's performance was deficient and (2) counsel's deficient performance prejudiced defendant. *Tate*, 2012 IL 112214, ¶ 18.

¶ 136         Illinois Supreme Court Rule 404(e) (eff. Sept. 1, 2023) provides: "In any case where a defendant is represented by a public defender ***, the attorney representing that defendant shall file a certification with the court, and that defendant shall be entitled to a waiver of assessments as defined in 725 ILCS 5/124A-20(a)." Generally, use of the word "shall" in a supreme court rule "imposes a mandatory obligation." *People v. Garstecki*, 234 Ill. 2d 430, 443 (2009). Pursuant to section 124A-20(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/124A-20(a) (West 2022)), "[a]ssessments" includes any "costs imposed on a criminal defendant under Article 15 of the Criminal and Traffic Assessment Act [(Assessment Act) (705 ILCS 135/1-1 *et seq.* (West 2022))]." Section 15-5 of the Assessment Act states that "for a felony offense, the Clerk of the Circuit Court shall collect $549." 705 ILCS 135/15-5 (West 2022).

¶ 137         Here, the trial court appointed an assistant public defender to represent defendant

after trial on his motion to reconsider sentence. Pursuant to Rule 404(e), defense counsel had a mandatory obligation to file a certification of waiver of assessments. However, defendant's posttrial counsel failed to file the certification. This constituted deficient performance under the first prong of *Strickland*. As a result of defense counsel's failure to file the certification, the court ordered defendant to pay $549 in assessments pursuant to section 15-5 of the Assessment Act. Had defense counsel filed the certification, the assessments would have been waived. See Ill. S. Ct. R. 404(e) (eff. Sept. 1, 2023). Thus, defendant was prejudiced by counsel's deficient performance. Because defendant established both prongs of his ineffective-assistance claim, we remand this matter to the court to allow defense counsel to file the appropriate Rule 404 certification of waiver of assessments.

¶ 138                                    III. CONCLUSION

¶ 139           For the reasons stated, we affirm the trial court's judgment and remand to allow defense counsel to file a certification of waiver of assessments.

¶ 140           Affirmed; cause remanded.